Filed 9/2/15

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| SAVE OUR SCHOOLS,<br><br>   Plaintiff and Appellant,<br><br>v.<br><br>BARSTOW UNIFIED SCHOOL<br>DISTRICT BOARD OF EDUCATION,<br><br>   Defendant and Respondent. | E060759<br><br>(Super.Ct.No. CIVBS1300156)<br><br>O P I N I O N |

APPEAL from the Superior Court of San Bernardino County.  Gilbert G. Ochoa,

Judge.  Reversed.

Johnson & Sedlack, Raymond W. Johnson, Abigail A. Smith, Kimberly A. Foy,

and Kendall Holbrook for Plaintiff and Appellant.

Atkinson, Andelson, Loya, Ruud & Romo, John W. Dietrich, Jennifer D. Cantrell,

Paul Z. McGlocklin, and S. Pete Serrano for Defendant and Respondent.

## I.  INTRODUCTION

Defendant and respondent, Barstow Unified School District Board of Education

(the District), approved closing two of its elementary schools, Thomson Elementary

1

School (Thomson) and Hinkley Elementary School (Hinkley), and transferring their students to other District "receptor" schools. The District determined that the closures and transfers were exempt from environmental review under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), because they fell within the categorical exemption for "minor additions" to schools (Pub. Resources Code, § 21080.18; Cal. Code Regs., tit. 14, § 15314 (Guidelines) [school closures and student transfers resulting in "minor additions to existing schools" are categorically exempt from CEQA "where the addition does not increase original student capacity" of any receptor school "by more than 25% or ten classrooms, whichever is less."]).[1]

A citizens group, plaintiff and appellant, Save Our Schools (SOS), petitioned the trial court for a peremptory writ setting aside the District's resolutions approving the closures and transfers and finding them exempt from CEQA. The petition was denied and SOS appeals, claiming: (1) insufficient evidence supports the District's determinations that the closures and transfers were exempt from CEQA, and (2) if the closures are exempt, then SOS met its burden showing that two exceptions to CEQA's categorical exemptions—the "cumulative impacts" and the "unusual circumstance" exceptions—applied. (Guidelines, § 15300.2, subds. (b), (c).)

---

[1] References to the Guidelines are to the state CEQA guidelines. (Guidelines, § 15000 et seq.) The Guidelines are binding on all public agencies in California in implementing the provisions of CEQA. (Guidelines, §§ 15000-15001.)

2

We reverse and remand the matter with directions to the trial court to issue a peremptory writ (1) voiding the District's resolutions approving the school closures and student transfers and (2) directing the District to reconsider its determination that the closures and transfers were exempt from CEQA review. (Pub. Resources Code, § 21168.9; Code Civ. Proc., § 1094.5, subds. (e), (f).) On remand, the District may accept and consider additional evidence not before it when it made its original exemption determinations. (See *Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, 525-535.)

The present administrative record contains insufficient evidence of the "original student capacity" (Guidelines, § 15314), or total enrollment before the transfers, of any of the receptor schools. It was therefore impossible for the District to determine, based on the record before it, that the closures and transfers would not increase the total student enrollment of any of the receptor schools beyond the levels allowed under the minor additions exemption. (*East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 174 (*East Peninsula*) [because school district allowed students to choose which transferee school to attend, it was "impossible" for the district to "properly determine compliance with [Guidelines,] section 15314"]; *San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1387-1389 (*San Lorenzo*) [proper compliance with Guidelines, § 15314 requires knowledge of receptor school's "original student capacity," or physical capacity to house students before the transfers].)

3

## II. BACKGROUND

At public meetings of its board in May, June, and December 2012, the District made it known that it was considering closing two of its schools, among other options, in order to meet its financial obligations in future school years. Student enrollment in the entire District had been declining since the 2006-2007 school year, and the District projected it would be unable to meet its financial obligations for the 2013-2014 and 2014-2015 school years unless it made substantial cuts in expenditures.

On February 22, 2013, the District held a "Hinkley School Reorganizational Meeting" at Hinkley. A notice of the meeting advised that enrollment in all District schools had declined by approximately 1,000 students since the 2006-2007 school year.[2] Then, at a February 26, 2013, public meeting of its board, the District addressed its superintendent's recommendation that it close both Hinkley and Thomson beginning in the 2013-2014 school year. At the meeting, the District informed the public that students from Hinkley and Thompson could choose to transfer to any one of several District "receptor" schools.

The designated receptor schools for Hinkley, a grade K-8 school, were Lenwood Elementary School (K-6), Skyline North Elementary School (K-6), and Barstow Jr. High School (BJHS) (7-8). The designated receptor schools for Thomson, a K-6 school, were four other K-6 schools: Henderson Elementary School, Skyline North Elementary

---

[2] On February 14, 2013, there were 5,827 students enrolled in all District schools, nearly 1,500 fewer than during the 2005-2006 school year when 7,313 students were enrolled.

School, Cameron Elementary School, and Crestline Elementary School. Thus, students from both Hinkley and Thomson could elect to transfer to Skyline North Elementary School.

A speaker at the February 26, 2013, board meeting asked what would happen if all of the students from Hinkley and Thomson chose to transfer to Skyline North Elementary School. District Superintendent Jeff Malan responded: "When we look at the number of students that are involved, I don't believe that would be the . . . full capacity of the Skyline North [E]lementary [School]." Another speaker then commented: "It doesn't seem like the school capacity's been investigated enough."

Near the close of the February 26 board meeting, the District adopted resolution Nos. 29 and 30, approving, respectively, the closures of Thomson and Hinkley, for the 2013-2014 school year and subsequent years. The District estimated the closures would save the District $600,000 annually. In each resolution, the District found that the closures and resulting student transfers to the receptor schools were exempt from CEQA review pursuant to Public Resources Code section 21080.18 and the "minor additions" to schools exemption of Guidelines section 15314, which exempts from CEQA review "minor additions to existing schools within existing school grounds where the addition does not increase original student capacity by more than 25% or ten classrooms, whichever is less . . . ." In adopting the resolutions, the Board did not indicate that it would limit the number of students allowed to transfer to Skyline North Elementary School or to any of the other District receptor schools, in order to keep enrollment at the

5

receptor schools below the levels allowed by the "minor additions" exemption. (Guidelines, § 15314.)

A notice of CEQA exemption for each closure was recorded on March 6, 2013. In March 2013, SOS, a self-described "after-formed unincorporated association" comprised of individuals "adversely affected by the [p]roject" and the District's "failure to comply with the law," petitioned the trial court for a writ of mandate setting aside the District's resolutions approving the closures and transfers, including the District's determination that the closures and transfers were exempt from CEQA review. The petition also sought an injunction preventing the District from closing the two schools pending the adjudication of the petition.

The District closed the schools in the spring of 2013, shortly after the close of the 2012-2013 school year, and students from Hinkley and Thompson were transferred to the receptor schools beginning in the 2013-2014 school year. Following a January 2014 hearing, the trial court denied the petition. SOS timely appealed.

### III. DISCUSSION

A. *CEQA's Three-step Process*

CEQA and the Guidelines establish a three-step process "to ensure that public agencies inform their decisions with environmental considerations." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380 (*Muzzy Ranch*); Guidelines, § 15002, subd. (k).) An overview of CEQA's three-step process will aid in understanding the statutory and regulatory context in which the District determined that

6

the two school closures and the resulting transfers of students to the receptor schools were exempt from CEQA review under section 15314 of the Guidelines.

The first step in the CEQA process is jurisdictional and requires the lead agency to conduct a preliminary review of the proposed activity to determine whether CEQA applies to the activity. (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 112; Guidelines, §§ 15060, 15061.) At the preliminary review stage, the lead agency must make two determinations: (1) whether the proposed activity is a "project" within the meaning of CEQA and, if so, (2) whether the project is exempt from environmental review under CEQA. (Guidelines, § 15002, subd. (k)(1); *San Lorenzo*, *supra*, 139 Cal.App.4th at pp. 1372-1373, 1380; but see *Muzzy Ranch*, *supra*, 41 Cal.4th at p. 380 [noting that the second tier of the CEQA process concerns exemption determinations].)

"[F]or CEQA to apply, the activity or decision at issue must constitute a 'project' under the statute. CEQA applies only to 'discretionary *projects* proposed to be carried out or approved by public agencies . . . .' ([Pub. Resources Code,] § 21080, subd. (a), italics added.)" (*San Lorenzo*, *supra*, 139 Cal.App.4th at p. 1376.) A project is exempt from CEQA if (1) the project is exempt by statute (Pub. Resources Code, § 21080, subd. (b); Guidelines, § 15061, subd. (b)); (2) the project is subject to one or more "categorical exemptions" set forth in sections 15301 to 15333 of the Guidelines *and* the application of the categorical exemption is not barred by an *exception* set forth in section 15300.2 of the Guidelines; or (3) the project is subject to the "commonsense" exemption, which applies when "'it can be seen with certainty that there is no possibility that the activity in

7

question may have a significant effect on the environment' . . . ." (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 380; *San Lorenzo*, *supra*, at pp. 1380-1381; Guidelines, § 15061, subd. (b)(3).)

If an agency properly determines that a project is exempt from CEQA, it is not required to subject the project to any further CEQA review. (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 380; *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74; Guidelines, § 15002, subd. (k)(1).) And, if the agency approves or determines to carry out the exempt project, it may but is not required to file a notice of exemption in order to shorten the limitations period for challenging its exemption determination. (Guidelines, §§ 15002, subd. (k)(1), 15062, subd. (a).) The filing of a notice of exemption triggers a 35-day limitations period for challenging the agency's exemption determination; if no notice of exemption is filed, a 180-day limitations period applies. (Guidelines, § 15062, subd. (d); *Apartment Assn. of Greater Los Angeles v. City of Los Angeles* (2001) 90 Cal.App.4th 1162, 1171.)

If a project does not fall within a CEQA exemption, the agency must proceed to the second step of the three-step CEQA review process and "'conduct an initial study to determine if the project may have a significant effect on the environment.' ([Guidelines], § 15063, subd. (a).)" (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 380; Guidelines, § 15002, subd. (k)(2) ["If the project is not exempt, the lead agency takes the second step and conducts an initial study ([Guidelines,] Section 15063) to determine whether the project may have a significant effect on the environment."].) If, after conducting the initial

8

study, the agency concludes there is no substantial evidence that the project or any of its aspects may cause a significant environmental effect, it must prepare a "negative declaration" briefly describing the reasons supporting its determination. (*Muzzy Ranch*, *supra*, at pp. 380-381; Guidelines, § 15063, subd. (b)(2).) If the agency concludes there is substantial evidence that any aspect of the project may cause one or more significant environmental effect, it must proceed to CEQA's third step and prepare an environmental impact report for the proposed project. (*Muzzy Ranch*, *supra*, at p. 381; Guidelines, § 15063, subd. (b)(1).) The agency may skip the initial study and prepare an environmental impact report if it determines that an environmental impact report will clearly be required for the project. (Guidelines, § 15063, subd. (a).)

Whether a project is categorically exempt from CEQA may require the agency to determine whether one or more *exception*s to the categorical exemption, set forth in Guidelines section 15300.2, applies. (*San Lorenzo*, *supra*, 139 Cal.App.4th at pp. 1386-1389.) "At the administrative level, once an agency 'determines based on substantial evidence in the record, that the project falls within a categorical exemption . . . , the burden shifts to the challenging party . . . "'to produce substantial evidence . . .'" . . . that one of the exceptions to categorical exemption applies.' [Citation.]" (*Id*. at p. 1389.)

In determining whether an exception applies, the agency is only required to determine whether there is substantial evidence that the project may have the particular environmental impacts described in the exception. (See Guidelines, § 15300.2.) By contrast, in conducting an initial study, after the agency has determined that the proposed

9

project is not exempt from CEQA (either because no exemption applies or an exception to a categorical exemption applies), the agency must determine whether the project may have *any* significant environmental effects, and "[a]ll phases of project planning, implementation, and operation must be considered in the initial study . . . ." (Guidelines, § 15063, subd. (a)(1).)  In many cases, this distinction may make little to no practical difference.  As observed in *East Peninsula*, "the amount of analysis and study involved at the preliminary review stage of determination of whether a project is exempt from CEQA may be similar to that involved at the 'second' stage where the agency conducts an initial study to determine whether the project has a significant effect on the environment. (Guidelines, § 15002[, subd.] (k))." (*East Peninsula*, *supra*, 210 Cal.App.3d at p. 173.)

Nonetheless, an agency's determination that an exception to a categorical exemption applies, during the preliminary review stage of the CEQA process, should not be conflated with the conduct of an initial study in the second-step of the CEQA process. An initial study may be much more broad-ranging than an exception determination, and the Guidelines plainly distinguish between the two inquiries:  "[An] . . . agency must first determine whether an activity is subject to CEQA [i.e., the agency must first determine whether an activity is a project and, if so, whether the project is exempt from CEQA] before conducting an initial study." (Guidelines, § 15060, subd (c).)

B.  *Insufficient Evidence Supports the District's Determination That the Closures and Transfers Were Exempt from CEQA (Pub. Resources Code, § 21080.18; Guidelines, § 15314)*

Public Resources Code section 21080.18 exempts from CEQA review "the closing of any public school in which kindergarten or any of grades 1 through 12 is maintained or the transfer of students from that public school to another school *if the only physical changes involved are categorically exempt* under Chapter 3 [of the Guidelines] (commencing with Section 15000) . . . ."  (Italics added.)  Public Resources Code section 21080.18 is not a true statutory exemption, but a categorical exemption because it only applies "if the only physical changes involved" in the public school closure are categorically exempt under the Guidelines.  (See *East Peninsula*, *supra*, 210 Cal.App.3d at pp. 166-169 [discussing legislative history preceding enactment of Pub. Resources Code, § 21080.18].)

The Guidelines contain 33 classes of categorically exempt projects.  (Guidelines, §§ 15301-15333.)  Each exempt class represents a class or category of projects that "ordinarily" have no significant environmental effects.  (*North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 851.)  Categorical exemptions are strictly construed, "in order to afford the fullest possible environmental protection." (*Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 697.)  Unlike statutorily exempt projects, which are "absolute" and not subject to exceptions, categorical exemptions are subject to exceptions in the Guidelines.

11

(*Save the Plastic Bag Coalition v. County of Marin* (2013) 218 Cal.App.4th 209, 224; Guidelines, § 15300.2.)

In finding that the closures of Hinkley and Thomson and the resulting transfers of their students to the receptor schools were exempt from CEQA, the District relied on Public Resources Code section 21080.18 and the class 14 exemption for "minor additions" to schools. (Guidelines, § 15314.) Guidelines section 15314 provides: "Class 14 consists of minor additions to existing schools within existing school grounds where the addition does not increase original student capacity by more than 25% or ten classrooms, *whichever is less*. The addition of portable classrooms is included in this exemption." (Italics added.)

The *San Lorenzo* court summarized the class 14 exemption as follows: "A school closure and accompanying transfer of students is exempt from CEQA so long as any resulting physical changes are categorically exempt. ([Pub. Resources Code,] § 21080.18.) Minor additions to the receptor school are categorically exempt. (Guidelines, § 15314.) A minor addition is defined as the lesser of: (1) the addition of 10 or fewer classrooms; or (2) an increase in original student capacity of 25 percent or less. (*Ibid.*) In this context, original student capacity means the receptor school's *preexisting physical ability* to house students." (*San Lorenzo*, *supra*, 139 Cal.App.4th at p. 1388, italics added.) Stated slightly differently, the phrase "original student capacity" (Guidelines, § 15314) means the receptor school's enrollment capacity, "physical space for housing students" or "number of students that can be accommodated physically at the

12

receptor school," *before* any students are transferred from the closed schools to the receptor school. (*San Lorenzo*, *supra*, at p. 1387.) The focus on the *physical effects* of a school closure on receptor schools is based on the principle that CEQA is concerned solely with *physical changes* to the environment. (*Ibid.*; Guidelines, § 15358, subd. (b).)

We review an agency's factual determination that a project is categorically exempt from CEQA for substantial evidence. (*San Lorenzo*, *supra*, 139 Cal.App.4th at pp. 1386-1389; *Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1251.) In determining whether substantial evidence supports an agency's exemption determination, we generally look only to the evidence in the administrative record at the time the agency made the exemption determination. (*San Lorenzo*, *supra*, at p. 1387, citing *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573; see also *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 750 ["'"Unless it can be demonstrated that the [agency's] actions are not grounded upon *any reasonable factual basis* the courts should not interfere with [the agency's] discretion or substitute their discretion for that of the [agency]."'" (Italics added.)].)

SOS claims insufficient evidence supports the District's determination that the "minor additions" to schools exemption (Guidelines, § 15314) applied to the closures of Thomson and Hinkley and the transfers of their students to the receptor schools. For purposes of CEQA, "'[s]ubstantial evidence' . . . means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion . . . ." (Guidelines, § 15384.) SOS maintains the administrative record

13

contains insufficient evidence to support the District's determination that the two school closures and resulting student transfers *would not* increase the "original student capacity" at any one of the receptor schools "by more than 25% or ten classrooms, whichever is less." (Guidelines, § 15314.) We agree.

The record shows that as of February 14, 2013, shortly before the District approved the closures and transfers at its February 26 meeting, 261 students attended Hinkley and 349 attended Thomson. Thus, assuming that enrollment at Hinkley and Thomson would have been the same during the 2013-2014 school year, closing the two schools meant that 610 students would be transferred to the receptor schools.

The record also shows the numbers of students enrolled at each of the receptor schools on February 14, 2013. For Hinkley, a K-8 school, the receptor schools and their enrollments on February 14, 2013, were Lenwood (K-6), with 381 students, Skyline North (K-6), with 413 students, and BJHS (7-8), with 654 students. For Thomson, a K-6 school, the receptor schools and their enrollment on February 14, 2013, were Skyline North (K-6), again with 413 students, Henderson (K-6), with 466 students, Cameron (K-6), with 491 students, and Crestline (K-6), with 464 students. These enrollment figures say nothing of the "original student capacity" or *enrollment capacity* of the receptor schools, however. (Guidelines, § 15314.)

The record indicates that all of the District's K-6 schools, including the receptor K-6 schools (i.e., all receptor schools except BJHS, a K-8 school), were operating at 60 to 65 percent of their enrollment capacity in February 2013, and their enrollment had been

14

declining for several years. But the record contains no information concerning the "original student capacity," or original student *enrollment* capacity, of any of the receptor schools before the transfers were made. (Guidelines, § 15314; *San Lorenzo*, *supra*, 139 Cal.App.4th at pp. 1387-1388.) The record thus contains no evidentiary basis upon which the District could have estimated each receptor school's original student capacity, or physical ability to house students, for the 2013-2014 school year, before any students from Hinkley and Thompson transferred to the receptor schools. It is possible that some of the receptor schools were operating at or near their enrollment capacity at the time of the transfers, while others were operating at less than 60 percent of their enrollment capacity.

This is a critical gap in the evidence. Without it, insufficient evidence supports the District's determination that the school closures and the resulting transfers of their 610 students to the receptor schools were exempt from CEQA under the minor additions exemption. (Guidelines, § 15314.) Without knowing the enrollment capacity of each receptor school, it was impossible for the District to properly determine that transfers *would not* cause the enrollment at any of the receptor schools to exceed 125 percent of the receptor school's enrollment capacity, or require fewer than 10 portable or permanent classrooms to be added to the receptor school. (*Ibid.*; *San Lorenzo*, *supra*, 139 Cal.App.4th at pp. 1388-1389 [calculating impact of student transfers based on receptor school's "current capacity"]; *East Peninsula*, *supra*, 210 Cal.App.3d at pp. 174-175

15

[same, but, in dicta, calculating impact of transfers to another receptor school based on the receptor school's current enrollment].)

The District's representation to the public at the February 26, 2013, board meeting —that students from Hinkley and Thomson would be able to choose which receptor school to attend—compounds the insufficiency of the evidence supporting the District's exemption determinations. At the meeting, the District board members and superintendent appeared to assume there was more than sufficient enrollment capacity at the receptor schools, whether individually or as a whole, to absorb the transfers. But the District did not indicate that it would limit enrollment at any of the receptor schools in order to ensure that the enrollment at any receptor school would not exceed 125 percent of its enrollment capacity before the transfers, or require the addition of 10 or more new classrooms to the receptor school. (Guidelines, § 15314.)

The record indicates, for example, that 63 of Hinkley's 261 transfer students would be in seventh and eighth grades in 2013-2014, and would have to be transferred to BJHS, the District's only middle school. BJHS's total enrollment was 751 on February 14, 2013. Adding Hinkley's 63 students to BJHS would have increased total enrollment at BJHS to 814 for the 2013-2014 school year, an increase of 8.4 percent. But the key figure to know is BJHS's enrollment *capacity* before the transfers, not BJHS's actual student enrollment before the transfers.

The record also indicates that if all of Hinkley's 198 grade K-6 students and all of Thomson's 349 grade K-6 students—547 students—elected to transfer to Skyline North

16

Elementary School for the 2013-2014 school year, then Skyline North's actual enrollment would have more than doubled, from 422 students in 2012-2013 to 969 students in 2013-2014. But again, without knowing the enrollment *capacity* of Skyline North before the transfers, insufficient evidence supports the District's determination that the closures and resulting transfers were exempt from CEQA under section 15314 of the Guidelines.

In addition to being exempt under Guidelines section 15314, the District argues that the closures and transfers are exempt under Guidelines section 15378, subdivision (b)(5), which states that "[o]rganizational or administrative activities of governments that will not result in direct or indirect physical changes in the environment" are not projects under CEQA. But as the District concedes, an increase in student enrollment "is not [a significant] environmental impact, unless the increase exceeds the threshold required in CEQA Guidelines section 15314." Thus, the District's argument that the organization and administrative activities exemption applies begs the question of whether the increases, if any, in total student enrollment at any of the receptor schools, as a result of the transfers, would not exceed the limitations of the minor additions to schools exemption. (Guidelines, § 15314.) If the transfers exceeded those limitations for any receptor school, the transfers were *not* exempt under Guidelines section 15378.

C. *Remand for Further Proceedings*

Public Resources Code section 21168.9 governs the "mandates" a court must issue in order to remedy a CEQA violation. If, following a trial, hearing, or appellate remand, a court finds that a public agency has made a determination, finding, or decision "without

17

compliance" with CEQA, the court is required to issue a peremptory writ of mandate "specifying what action by the public agency is necessary to comply with [CEQA]." (Pub. Resources Code, § 21168.9, subds. (a), (b); *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 756-757.)

The writ must direct the agency to do at least one of the following: (1) void its determination, finding, or decision, in whole or in part (Pub. Resources Code, § 21168.9, subd. (a)(1)); (2) suspend a specific project activity which could cause an adverse change to the environment; or (3) "take specific action as may be necessary to bring the [agency's] determination, finding, or decision into compliance with [CEQA]" (*id.,* subd. (a)(3); *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 286-287). The writ must also specify that the trial court "retain[s] jurisdiction over the public agency's proceedings by way of a return to the peremptory writ until the court has determined that the public agency has complied with [CEQA]" (Pub. Resources Code, § 21168.9, subd. (b)), but the writ may not "direct any public agency to exercise its discretion in any particular way" (*id*., subd. (c)).

Public Resources Code section 21168.9 gives courts "some flexibility in tailoring a remedy to fit a specific CEQA violation." (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (2001) 89 Cal.App.4th 1097, 1103-1104 [Fourth Dist. Div. Two].) The statute is a specific application of the general rule contained in Code of Civil Procedure section 1094.5, subdivision (f): "'The court shall enter judgment either commanding respondent to set aside the order or decision, or denying the writ. Where

18

the judgment commands that the order or decision be set aside, it may order the reconsideration of the case in the light of the court's opinion and judgment and may order respondent to take such further action as is specifically enjoined upon it by law, but the judgment shall not limit or control in any way the discretion legally vested in the respondent.'" (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist.*, *supra*, at p. 1103.)

We have concluded that the District violated CEQA because insufficient evidence supports its determination that the closures of Hinkley and Thomson, and the resulting transfers of students from those schools to other District "receptor" schools, were exempt from CEQA pursuant to the class 14 categorical exemption for "minor additions" to schools. (Guidelines, § 15314; *Association for Protection Etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 727-729 [agency violates CEQA if insufficient evidence supports its exemption determination]; Pub. Resources Code, § 21168.5.)

At least two mandates are necessary to bring the District's factually unsupported exemption determinations into compliance with CEQA: a peremptory writ directing the District (1) to void its determinations that the closures of Hinkley and Thomson and the resulting transfers of their students to the receptor schools were exempt from CEQA under the minor additions to schools exemption of Guidelines section 15314 (Pub. Resources Code, § 21168.9, subd. (a)(1)), and (2) to reconsider whether the closures and transfers were exempt from CEQA under the minor additions exemption, or any other exemption, at the time the District approved closures and transfers in February 2013

19

(Pub. Resources Code, § 21168.9, subd. (a)(3)).  The trial court may include additional mandates in the writ as it deems necessary to ensure compliance with CEQA.  (See *San Bernardino Valley Audubon Society v. Metropolitan Water Dist.*, *supra*, 89 Cal.App.4th at pp. 1103-1105.)

The District argues that because Hinkley and Thomson were closed in 2013 and their students were transferred to the receptor schools beginning in the 2013-2014 school year, no effective relief can be granted on SOS's writ petition and the petition is therefore moot.  SOS argues its petition is not moot because the District could reopen Hinkley and Thompson.  On the record before us, the writ petition is not necessarily moot.  If, following remand, the District is unable to determine, based on substantial evidence, that the closures and transfers were exempt from CEQA review when they were approved in 2013, the trial court may be able to provide SOS effective relief by, for example, ordering the District to (1) reopen the schools, or (2) take other steps to mitigate any adverse environmental impacts of the closures and transfers.  (See *Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888.)

Following the court's issuance of the peremptory writ on remand, the District may consider additional evidence not before it when it determined, at the February 26, 2013, meeting of its board, that closures and transfers were exempt from CEQA.  (See *Voices of the Wetlands v. State Water Resources Control Bd.*, *supra*, 52 Cal.4th at pp. 525-535; *Keeler v. Superior Court* (1956) 46 Cal.2d 596, 600; Cal. Adm. Hearing Practice (Cont.Ed.Bar 2d ed. 2014) Decision and Review, § 8.121, pp. 8-79 to 8-80.)  As

20

discussed, the present administrative record contains insufficient evidence of the "original student capacity," before the transfers, of any of the receptor schools. (Guidelines, § 15314.) If the District wishes to rely on the minor additions exemption on remand, it is critical that it ascertain the original student capacity of each receptor school before the transfers, and whether the transfers required the addition of any new classrooms to any of the receptor schools. (*San Lorenzo*, *supra*, 139 Cal.App.4th at pp. 1388-1389.)

If the District once again determines that the closures and transfers were exempt from CEQA under the minor additions exemption (Guidelines, § 15314) or any other categorical exemption, the burden will shift to SOS and any other persons challenging the District's exemption determination to produce substantial evidence showing that an *exception* to the minor additions exemption applied (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1104-1105 (*Berkeley Hillside*); Guidelines, § 15300.2). On this appeal, SOS claims the cumulative impacts and unusual circumstance *exceptions* applied. (Guidelines, § 15300.2, subds. (b), (c).) On remand, SOS and other challengers must be given an opportunity to produce evidence supporting these and other applicable exceptions to the minor additions exemption. (See *East Peninsula*, *supra*, 210 CalApp.3d at pp. 172-173.)

For guidance on remand, we observe that the "cumulative impact" exception applies, "when the cumulative impact of successive projects of the same type in the same place, over time is significant." (Guidelines, § 15300.2, subd. (b).) In determining

21

whether the cumulative impacts exception applies, the District must consider the cumulative impacts of the closures of both Hinkley and Thompson, and the resulting transfers of their students to the receptor schools, together.  The economic and social effects of a project are not to be treated as significant effects on the environment.  (Guidelines, §§ 15131, subd. (a), 15064, subd. (f)(6).)

The "significant effect" or "unusual circumstance" exception applies "where there is a reasonable possibility that the activity will have a significant effect on the environment *due to unusual circumstances*."  (Guidelines, § 15300.2, subd. (c), italics added.)  In *Berkeley Hillside*, our state Supreme Court held that, for the unusual circumstance exception to apply, "it is not alone enough that there is a reasonable possibility the project will have a significant environmental effect; instead, . . . there must be 'a reasonable possibility that the activity will have a significant effect on the environment *due to unusual circumstances*.'"  (*Berkeley Hillside*, *supra*, 60 Cal.4th at pp. 1097-1105.)  The court explained:  "[T]o establish the unusual circumstances exception, it is not enough for a challenger merely to provide substantial evidence that the project *may* have a significant effect on the environment, because that is the inquiry CEQA requires absent an exemption.  ([Pub. Resources Code,] § 21151.)  Such a showing is inadequate to overcome the [Secretary of the Natural Resources Agency]'s determination that the typical effects of a project within an exempt class are not significant for CEQA purposes.  On the other hand, evidence that the project *will* have a significant effect *does* tend to prove that some circumstance of the project is unusual.  An agency presented with

22

such evidence must determine, based on the entire record before it—including contrary evidence regarding significant environmental effects—whether there is an unusual circumstance that justifies removing the project from the exempt class." (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105.)

## IV.  DISPOSITION

The judgment denying SOS's writ petition is reversed.  The matter is remanded to the trial court with directions to issue a peremptory writ of mandate to the District, consistent with the views expressed in this opinion.  SOS shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278.)

CERTIFIED FOR PUBLICATION


KING
J.


We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.