Filed 6/25/20

**CERTIFIED FOR PARTIAL PUBLICATION***


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| SAVE BERKELEY'S NEIGHBORHOODS,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,<br><br>    Defendants and Respondents. | A157551<br><br>(Alameda County<br>Super. Ct. No. RG18-902751) |


This case requires us to consider public universities' obligations to analyze student enrollment increases under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA).[1] CEQA requires public universities to mitigate the environmental impacts of their growth and development. (*City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 349 (*City of Marina*).) In this context, growth includes student enrollment increases, which the Legislature has acknowledged "may negatively affect the surrounding environment." (Ed. Code, § 67504, subd. (b)(1).) "Consistent with the requirements of [CEQA],"

---

**\*** Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts C., D., and E. of the Discussion.

    [1] Undesignated section references are to the Public Resources Code.

the Legislature intends that the University of California "sufficiently mitigate significant off-campus impacts related to campus growth and development." (*Ibid.*)

The University of California is required periodically to develop a comprehensive, long-range development plan (development plan) to guide development for each campus, based on the academic goals and projected enrollment for that campus. (Ed. Code, § 67504, subd. (a)(1).) Under section 21080.09, the development plan must be analyzed in an environmental impact report (EIR) under CEQA. (§ 21080.09, subd. (b).) The EIR must also consider "[e]nvironmental effects relating to changes in enrollment levels" for the campus. (§ 21080.09, subd. (b).) An enrollment plan satisfies CEQA only after the environmental effects of the plan have been analyzed and addressed as CEQA requires. (§ 21080.09, subd. (d).)

At issue here is a 2005 EIR that analyzes a development plan and projected enrollment increases for the U.C. Berkeley campus. Save Berkeley's Neighborhoods (Save Berkeley) alleges the Regents of the University of California, the President of the University of California, Janet Napolitano, and the Chancellor of the University of California, Berkeley, Carol Christ (collectively, respondents ) violated CEQA when they increased enrollment well beyond the growth projected in the 2005 EIR without conducting further environmental review. Citing section 21080.09, the trial court ruled that respondents satisfied CEQA by analyzing projected enrollment in the 2005 development plan EIR and had no duty to analyze the environmental impacts of subsequent enrollment increases. It therefore sustained a demurrer to Save Berkeley's petition for writ of mandate and complaint for declaratory relief. In the published portion of this opinion, we conclude the trial court misinterpreted section 21080.09. The statute does

not shield public universities from complying with CEQA when they make discretionary decisions to increase enrollment levels. Accordingly, we reverse the judgment.

## BACKGROUND

### A.

Save Berkeley is a California nonprofit formed to improve Berkeley's quality of life and protect its environment. The Regents of the University of California (Regents) are the governing body of the University of California (U.C.) and serve as the CEQA lead agency with responsibility for preparing and certifying EIRs.

In 2005, the Regents adopted a development plan to guide the U.C. Berkeley campus through 2020 and certified a "program EIR" for the development plan (2005 EIR). (See Cal. Code Regs., tit. 14, § 15168, subd. (a) [describing program EIRs].)[2] The development plan and the 2005 EIR projected that, by the year 2020, U.C. Berkeley's student enrollment would increase by 1,650 students (above the 2001-2002 average head count of between 31,800 to 33,450 students). Both documents also projected U.C. Berkeley would add 2,500 beds for students.

Save Berkeley alleges that, beginning in 2007, respondents made a series of discretionary decisions to increase enrollment well beyond the projection analyzed in the 2005 EIR. Save Berkeley alleges respondents have continued to approve increases, without formal decisions, public notice, or further environmental review, in every two-semester period since 2007. By April 2018, U.C. Berkeley's actual student enrollment had grown by a total of approximately 8,300 students—a five-fold increase over the 2005 projection.

---

[2] All further references to "Guidelines" are to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.).

3

**B.**

In 2018, Save Berkeley filed a petition for writ of mandate (Code of Civ. Proc., § 1085) and a complaint for declaratory relief (*id.*, § 1060) challenging respondents' decisions to increase enrollment without further CEQA review.

In its operative (third amended) petition, Save Berkeley alleges as follows. When respondents prepared the 2005 EIR for the development plan, the projected increase of 1,650 students was part of the "project description," as that term is used in CEQA.[3] (See Guidelines, § 15124.) Respondents then changed the project when they approved enrollment increases beyond this amount. These enrollment increases caused, and continue to cause, significant environmental impacts that were not analyzed in the 2005 EIR, including increased use of off-campus housing by U.C. Berkeley students (leading to increases in off-campus noise and trash), displacement of tenants and a consequent increase in homelessness, more traffic, and increased burdens on the City of Berkeley's public safety services (police, fire, and ambulance). According to Save Berkeley, CEQA requires respondents to prepare an EIR to analyze these impacts and to identify and adopt mitigation measures to reduce them.

Save Berkeley also alleges it learned of the decisions to increase enrollment (above the 1,650 projection) on October 30, 2017 and that it could not have discovered the decisions earlier through the exercise of reasonable diligence. Save Berkeley asks the court to compel respondents to prepare and

---

[3] Save Berkeley's petition sometimes refers to the development plan (or the "2020 LRDP" [Long Range Development Plan]) when it apparently means, more precisely, the CEQA project described in the 2005 EIR—for example: "[t]he 2020 LRDP is a 'program' type of CEQA project." At oral argument, Save Berkeley's counsel offered to correct the terminology in an amended petition, but we find the allegations clear enough for pleading purposes.

4

certify an EIR.  In its derivative request for declaratory relief, Save Berkeley seeks a judicial declaration that respondents' policy of increasing student enrollment without environmental review violates CEQA.

## C.

Respondents demurred, contending Save Berkeley cannot state a cause of action for violation of CEQA because, under section 21080.09, the enrollment increases are not a CEQA "project" or a project change requiring subsequent environmental review.  Respondents also argued Save Berkeley's claims were barred by the applicable statute of limitations or moot.  In support of the latter argument, respondents asked the trial court to judicially notice their issuance of a "Notice of Preparation of a Draft Supplemental [EIR]" for a project entitled "Upper Hearst Development for the Goldman School of Public Policy [(Goldman School)] and Minor Amendment to the 2020 Long Range Development Plan," which is dated August 15, 2018.  Respondents contended the Goldman School EIR would analyze not only a new physical development but also the increase in current and foreseeable campus population levels.

The trial court sustained the demurrer without leave to amend, concluding Save Berkeley's petition was barred by the statute of limitations "[t]o the extent [it] challenges the adequacy of the 2005 EIR" and that " 'informal, discretionary decisions' to increase student enrollment beyond that anticipated in the [development plan]" did not constitute "project changes" necessitating CEQA review.  The court reasoned: "The [development plan], as statutorily defined, is not a student enrollment plan.  Rather, it is 'a physical development and land use plan' for a campus of public higher education.  (See § 21080.09, subd. (a)(2).)  Environmental effects relating to projected changes in enrollment levels are to be considered in the [EIR]

5

prepared for the long range development plan ( . . . § 21080.09, subd. (b)), but any discrepancies between the estimated changes in enrollment levels and the actual enrollment levels in subsequent years are not themselves project or program changes that require subsequent [CEQA] review.  The Regents' 2005 analysis of the estimated projections of enrollment changes by 2020, as set forth in the 2005 EIR and the [development plan], satisfied the Regents' obligations to consider the environmental impact of those enrollment plans. (See . . . § 21080.09(d).)"  Separately, the court denied Save Berkeley's motion to compel discovery of documents relating to enrollment increases, concluding the document requests were overbroad.  The court dismissed the case.

## DISCUSSION

Save Berkeley argues: (1) it stated a cause of action for violation of CEQA by alleging respondents substantially increased enrollment without analyzing the environmental impacts of those decisions;  (2) the trial court's construction of section 21080.09 is inconsistent with the plain language of the statute, its legislative history, and long standing CEQA principles; and (3) the trial court erred by denying Save Berkeley's motion to compel discovery. In the published part of our opinion, we agree with Save Berkeley on the first two points.  In the unpublished portion, we conclude Save Berkeley has failed to meet its burden to show error in the discovery ruling.

### A.

### 1.

"In reviewing the sufficiency of a complaint against a general demurrer, this court treats the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law." (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43.)  We also consider matters that may be judicially noticed.  "When a

6

demurrer is sustained, this court determines whether the complaint states facts sufficient to constitute a cause of action." (*Ibid*.) "Allegations must be factual and specific, not vague or conclusionary." (*Id.* at p. 44.) However, a "complaint ordinarily is sufficient if it alleges ultimate rather than evidentiary facts." (*Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 550.)

We review the trial court's interpretation of CEQA de novo, keeping in mind the Legislature's requirement " 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1184.) We also give " 'great weight' " to the Secretary for Natural Resources' interpretation of CEQA in the Guidelines. (*Id*., at p. 1184.)

**2.**

When a public agency proposes to undertake an activity potentially within CEQA's scope, CEQA prescribes a three-step process. (Guidelines, § 15002, subd. (b) and (k).) First, the agency must decide if the activity is a "project" i.e., an activity that "may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (§ 21065.) Second, if it is a project, the agency must decide whether the project is exempt from CEQA review. (See Pub. Resources Code, §§ 21080, 21084, subd. (a); Guidelines, § 15300 et seq.) Third, if no exemption applies and the project may have a significant environmental effect, the agency must prepare an EIR before approving the project. (§§ 21100, subd. (a), 21151, subd. (a), 21080, subd. (d), 21082.2, subd. (d); see *California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 384.) The agency has an affirmative duty to mitigate or avoid the project's significant environmental impacts where feasible. (Pub.

7

Resources Code, §§ 21002.1, 21061, 21081, subd. (a); Guidelines, § 15021, subd. (a).)

The EIR is the "heart of CEQA." (Guidelines, § 15003, subd. (a).) Its purpose is "to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (§ 21061.) The EIR thus works to " 'inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made,' thereby protecting ' "not only the environment but also informed self-government." ' " (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 944-945 (*San Mateo Gardens*).)

Once an EIR is certified and the limitations period has passed, the EIR is conclusively presumed to comply with CEQA regardless of any flaws. (§ 21167.2; *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1130.) Here, nobody disputes that the 2005 EIR cannot be challenged because the statute of limitations has expired. (§§ 21167, 21167.2.) But Save Berkeley alleges that respondents changed the original project and that the changes will have significant environmental effects that were not examined in the 2005 EIR. This requires us to consider two additional CEQA concepts concerning an agency's duty to conduct additional environmental review after it has certified an EIR.

The first concept is tiering. The 2005 EIR is a *program* EIR, which is a type of EIR that agencies often use to examine a broad program or plan that will be followed by more narrow, related projects, which can be analyzed in more focused CEQA documents that "tier" from the program EIR. (See

8

generally, Guidelines §§ 15152 [tiering], 15168 [program EIRs].) "Tiering is proper 'when it helps a public agency to focus upon the issues ripe for decision at each level of environmental review and in order to exclude duplicative analysis of environmental effects examined in previous environmental impact reports.' " (*In re Bay-Delta Etc.* (2008) 43 Cal.4th 1143, 1170.) A tiered EIR is required for a later project consistent with the larger program if the project may cause significant environmental effects that were not examined in the prior EIR. (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1319; § 21094, subds. (a)-(c).)

The second concept concerns situations where the agency proposes changing the original project. If the changes would require major revisions to the prior EIR, the agency must prepare either a subsequent or supplemental EIR, depending on the magnitude of the necessary revisions. (Pub. Resources Code, § 21166; Guidelines, §§ 15162, subd. (a)(1), 15163, subd. (a); *San Mateo Gardens*, *supra*, 1 Cal.5th at p. 943.) This standard is triggered by, among other things, changes to the project that would cause new or increased significant environmental effects. (Pub. Resources Code, § 21166; Guidelines, § 15162, subd. (a)(1).) When section 21166 applies, the agency must prepare a subsequent or supplemental EIR rather than a tiered EIR. (*Sierra Club v. County of Sonoma, supra,* 6 Cal.App.4th at pp. 1319-1320; § 21094, subd. (b)(3).)

The question before us is whether the alleged changes to the 2005 project—i.e., the decisions to increase enrollment beginning in 2007— required some form of environmental review under CEQA.

**3.**

9

Setting aside section 21080.09 for the moment, we have no trouble concluding Save Berkeley has stated a valid cause of action.

Save Berkeley alleges that the "project" (§ 21065) analyzed in the 2005 EIR included a plan to stabilize enrollment and projected a modest enrollment increase of 1,650 students between 2005 and 2020. Respondents later made several discretionary decisions to change the project by increasing enrollment beyond 1,650 students. The enrollment increases have caused, and continue to cause, significant environmental impacts that were not analyzed in the 2005 EIR. Respondents have failed to analyze the new impacts in a CEQA document and have failed to adopt mitigation measures to reduce or avoid them.

Accepting these allegations as true, as we must, Save Berkeley has adequately pled that respondents made substantial changes to the original project that trigger the need for a subsequent or supplemental EIR. (Pub. Resources Code, § 21166, subd. (a); Guidelines, §§ 15162, subd. (a) and 15153, subd. (a); see *American Canyon Community United for Responsible Growth v. City of American Canyon* (2006)145 Cal.App.4th 1062, 1077 ["Courts have acknowledged that an increase in the size of a development project can be a substantial change triggering subsequent environmental review"].) This is a routine application of basic CEQA requirements.

## B.

Respondents' main argument is that section 21080.09 effectively exempts them from analyzing the changed increases in enrollment unless or until a physical development project is approved. We disagree.

### 1.

10

Section 21080.09 states:

(a) For purposes of this section, the following definitions apply:

[¶]

(2) "Long range development plan" means a physical development and land use plan to meet academic and institutional objectives for a particular campus or medical center of public higher education.

(b) The selection of a location for a particular campus and the approval of a long range development plan are subject to [CEQA] and require preparation of an environmental impact report. Environmental effects relating to changes in enrollment levels shall be considered for each campus or medical center of public higher education in the environmental impact report prepared for the long range development plan for the campus or medical center.

(c) The approval of a project on a particular campus or medical center of public higher education is subject to [CEQA] and may be addressed, subject to other provisions of [CEQA], in a tiered environmental analysis based upon a long range development plan environmental impact report.

(d) Compliance with this section satisfies the obligations of public higher education pursuant to [CEQA] to consider the environmental impact of academic and enrollment plans as they affect campuses or medical centers, provided that any such plans shall become effective . . . only after the environmental effects of those plans have been analyzed as required by [CEQA] in a long range development plan environmental impact report or tiered analysis based upon that environmental impact report . . ., and addressed as required by [CEQA].

Respondents' rather confusing interpretation of this statute hinges largely on the definition of "long range development plan" in section

11

21080.09, subdivision (a)(2). Respondents point out that the definition omits the word "enrollment." Construed together with section 21080.09, subdivision (b), which directs universities to "prepar[e]" an EIR for a development plan and to "consider" enrollment changes in the same EIR, respondents argue that the Legislature limited the EIR project to the development plan and excluded enrollment changes from the project . Tacitly acknowledging CEQA's broad definition of "project" under section 21065 could include decisions to increase enrollment, respondents claim that section 21080.09 trumps section 21065 because it is more specific. Further, pointing to subdivisions (c) and (d), respondents claim that the statute directs them to consider subsequent enrollment increases *only* if they are otherwise preparing a tiered or subsequent EIR for development plans or related physical development projects. Although they avoid the term exemption, respondents argue in effect that, absent a development plan or a "physical development project," the statute exempts them from analyzing enrollment decisions in any kind of EIR, including a stand-alone, tiered, subsequent, or supplemental EIR.

The statute does nothing of the kind. First, nowhere does it purport to exclude enrollment increases from the broad definition of a "project" under section 21065. In fact, the traditional definition of a CEQA project harmonizes easily with section 21080.09. (See *Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 838 [courts must harmonize statues unless they are irreconcilable].) Under CEQA, the project determines which impacts must be analyzed. (See Guidelines, § 15126.2, subd. (a) ["An EIR shall identify and focus on the significant effects of the proposed project on the environment"].) Public agencies must construe the project broadly to capture the whole of the action

12

and its environmental impacts. (Guidelines, § 15378; *Bozung v. Local Agency Formation Com*. (1975) 13 Cal.3d 263, 283-284, superseded by statute on another ground as stated in *City of Redding v. Shasta County Local Agency Formation Com*. (1989) 209 Cal.App.3d 1169, 1177; *Nelson v. County of Kern* (2010) 190 Cal.App.4th 252, 271-272.) The Legislature has recognized that both enrollment levels and physical development are related features of campus growth that must be mitigated under CEQA. (See Ed. Code, § 67504, subd. (a)(1) [campus development plans are based, in part, on projected enrollment levels], subd. (b)(1) [legislative finding that "the expansion of campus enrollment and facilities may negatively affect the surrounding environment" and must be mitigated "[c]onsistent with the requirements of" CEQA].) Thus, when a public university prepares an EIR for a development plan, section 21080.09 requires universities to *expand* the analysis to include a related feature of campus growth, future enrollment projections, which is entirely consistent with the traditional, broad definition of a CEQA project. (§ 21080.09, subd. (b).)

Second, the statute does not say that enrollment changes need *only* be analyzed in an EIR for a development plan or physical development. When a university prepares an EIR for a development plan, section 21080.09, subdivision (b) requires the university to analyze "[e]nvironmental effects relating to changes in enrollment levels" in that EIR. It does not address subsequent enrollment decisions, much less exempt them from CEQA review. (See *Citizens for a Responsible Caltrans Decision v. Department of Transportation* (2020) 46 Cal.App.5th 1103, 1125 [courts recognize only express CEQA exemptions].) Similarly, section 21080.09, subdivision (d), says that "[c]ompliance with this section" satisfies CEQA with respect to "enrollment plans . . . only after the environmental effects of those plans"

13

have been both analyzed and addressed under CEQA together with a development plan. It does not say that subsequent changes to enrollment plans—with new or increased environmental effects that have *not* been analyzed and addressed—are exempt from CEQA. (§ 21080.09, subd. (d).)

This is made obvious by section 21080.09, subdivision (c), which potentially addresses enrollment decisions made after the approval of a development plan EIR. That section states that the approval of a "project" on a campus is "subject to [CEQA]" and "may be addressed, subject to other provisions of [CEQA]," in an EIR that tiers from a development plan EIR. This, too, easily harmonizes with traditional CEQA rules. As explained above, a public university's decision to increase enrollment levels can be a "project" subject to CEQA whether or not it is related to a development plan. (§ 21065.) When tiering is appropriate, the agency has the option of analyzing that project in a tiered EIR. (See Guidelines, § 15152; § 21080.09, subd. (c).) Given Save Berkeley's allegations of a project change in this case, however, "other provisions" of CEQA (§ 21080.09, subd. (c)) may require a subsequent or supplemental EIR instead of a tiered EIR. (See § 21094, subd. (b)(3) [when section 21166 applies, the agency must prepare a subsequent or supplemental EIR rather than a tiered EIR]; *Natural Resources Defense Council, Inc. v. City of Los Angeles* (2002) 103 Cal.App.4th 268, 282 ["Sometimes a 'tiered' EIR is required (§ 21094), sometimes a 'subsequent or supplemental' EIR is required (§ 21166), and sometimes a 'supplement' to an EIR is required"].) In short, subsection (c) confirms that public universities must comply with CEQA before they approve actions—including, potentially, decisions to increase enrollment levels—that qualify as a project under the traditional definition.

Third, and finally, our construction of section 21080.09 is consistent with CEQA's other provisions and its purpose. (*Union of Medical Marijuana Patients, Inc. v. City of San Diego*, *supra*, 7 Cal.5th at pp. 1190-1191 [CEQA provisions must be interpreted in the context of the entire statute].) This case illustrates why. In 2005, respondents analyzed the impacts of increasing enrollment at the U.C. Berkeley campus by a modest amount (1,650 students) in an EIR developed in a public process. Starting just two years later, respondents allegedly made a series of decisions to increase enrollment fivefold with no public notice, no CEQA analysis, and no mitigation of environmental impacts. This undercuts the fundamental premise of CEQA to ensure informed decisionmaking and meaningful public participation by disclosing the environmental impacts of decisions *before* the decisions are made (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 395) as well as CEQA's requirement for agencies to mitigate significant environmental effects when feasible. (Pub. Resources Code, §§ 21002.1, 21061, 21081, subd. (a); Guidelines, § 15021, subd. (a).) Our interpretation of section 21080.09 honors the Legislature's intention that public universities comply with CEQA and mitigate the impacts of their growth and development. (Ed. Code, § 67504, subd. (b)(1); Pub. Resources Code § 21080.09, subds. (b)-(d); *City of Marina*, *supra*, 39 Cal.4th at p. 349.)

**2.**

For all the above reasons, we agree with Save Berkeley that the plain language of section 21080.09 does not exempt respondents' decisions to increase enrollment at the Berkeley campus from CEQA review. But even if we assume some ambiguity exists in the statutory language, the legislative

history leaves no doubt.[4]   (See *Medical Marijuana Patients*, *supra*, 7 Cal.5th at p. 1184.)

The California Natural Resources Agency's Enrolled Bill Report explains that the University of California supported enactment of section 21080.09 (Stats. 1989, ch. 659, § 1) and that the intent of the legislation was "*solely* to avoid a potential argument that changes in student enrollment levels, and any environmental impacts therefrom, must be addressed on a statewide or system-wide basis, rather than at each campus . . . individually." (Cal. Natural Resources Agency, Enrolled Bill Rep. on Sen. Bill No. 896 (1989-1990 Reg. Sess.) prepared for Governor Deukmejian (Sep. 14, 1989), p. 2.)  The Enrolled Bill Report also states, "The University . . . *does not seek to be excused* from the ordinary requirements of CEQA." (*Ibid.,* italics added, underline omitted.)  This same modest intent is confirmed in numerous committee analyses.  (See, e.g., Sen. Com. on Governmental Organization, Rep. on Sen. Bill No. 896 (1989-1990 Reg. Sess.) as amended April 18, 1989, pp. 1-2; Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 896 (1989-1990 Reg. Sess.) as amended May 30, 1989, pp. 1-2; Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 896 (1989-1990 Reg.

---

[4] Save Berkeley requested judicial notice of section 21080.09's legislative history.  We grant the request for judicial notice of the legislative history, over respondents' opposition.  (See Evid. Code, § 452, subd. (c); *Elsner v. Uveges* (2004) 34 Cal.4th 915, 934, fn. 19 ["we have routinely found enrolled bill reports, prepared by a responsible agency contemporaneous with passage and before signing, instructive on matters of legislative intent"].)  Save Berkeley also asks us to take judicial notice of certain responses to public comments from the 2005 EIR.  Save Berkeley argues the comments are relevant to show respondents have previously taken a position contrary to that taken in the instant litigation.  We deny the latter request for judicial notice because Save Berkeley fails to show relevance.  (*Doe v. City of Los Angeles, supra,* 42 Cal.4th at p. 544, fn. 4.)

16

Sess.) as amended Aug. 21, 1989, pp. 1-2.)  The statute's language reflects this legislative intent, repeatedly framing the universities' obligations in terms of a "campus" (§ 21080.09, subds. (b), (c), (d).)

The legislative history is completely at odds with respondents' interpretation.

**3.**

We reject respondents' arguments that applying ordinary CEQA principles to enrollment increases would require annual CEQA review of enrollment levels, would turn enrollment projections into an enrollment cap, and would interfere with the Regents' authority over public higher education.

First, respondents have options to avoid annual CEQA review.  For example, they could analyze a range of enrollment levels in a program EIR, based on reasonable estimates for high and low scenarios, giving them CEQA coverage for year-to-year variability and for increases within the range. Agencies routinely use program EIRs to avoid preparing multiple EIRs for a series of actions.  (See generally, Kostka & Zischke, *Practice Under the California Environmental Quality Act* (CEB 2019), §§ 10.13-10.21.)

Second, our decision in no way caps enrollment at the University of California or obstructs the Regents' authority.  We are merely requiring the Regents to comply with CEQA.  "[W]hile education may be [the University of California's] core function, to avoid or mitigate the environmental effects of its projects is also one of [its] functions." (*City of Marina, supra,* 39 Cal.4th at p. 360; Ed. Code, § 67504, subd. (b)(1).)

The trial court erred in sustaining the demurrer without leave to amend as to both claims for relief (mandamus and declaratory relief).

**C.**

As an alternative basis for affirming the judgment, respondents argue that the petition, initially filed on April 27, 2018, is untimely. They contend Save Berkeley's challenge is barred because more than 180 days have passed since the "commencement of the project" (§ 21167, subd. (a))—the start of the 2007 academic year. We disagree.

For a demurrer based on the statute of limitations to be sustained, the untimeliness of the lawsuit must clearly and affirmatively appear on the face of the complaint and matters judicially noticed. (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42.) When the cause of action *might* be, but is not necessarily, time-barred, the demurrer must be overruled. (*Ibid*.)

Respondents are correct that Save Berkeley appears to challenge a series of decisions made in 2007 and thereafter. However, at the demurrer stage, we cannot resolve the factual issues underlying respondents' statute of limitations defense. Save Berkeley has alleged it lacked actual or constructive notice of the enrollment increases before October 30, 2017, an allegation we must accept as true on demurrer. Accordingly, Save Berkeley has alleged sufficient facts to survive demurrer. (See *Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 939, italics added ["if the agency makes substantial changes in a project after the filing of the EIR and fails to file a later EIR in violation of section 21166, subdivision (a), an action challenging the agency's noncompliance with CEQA may be filed within 180 days of the time the plaintiff *knew or reasonably should have known that the project under way differs substantially* from the one described in the EIR"].)

18

**D.**

We also reject respondents' arguments that Save Berkeley's petition is moot. "[A] case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief." (*Lincoln Place Tenants Assn. v. City of Los Angeles* (2007) 155 Cal.App.4th 425, 454.) Respondents' arguments are spurious.

First, respondents claim that they reviewed the enrollment increases recently in the Goldman School EIR, and thus they have already done "exactly what [Save Berkeley] asks." The Goldman School EIR is not before us. Respondents cite nothing in the record to demonstrate that it properly analyzed the increases. They forfeit the argument. (*Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859, 877-878.)

Second, respondents claim that they cannot analyze or mitigate the enrollment levels of past classes because those classes have "long since departed U.C. Berkeley" and "no longer exist." But Save Berkeley is asking respondents to mitigate the past and ongoing impacts of their decisions to increase enrollment *levels*. Respondents do not suggest that enrollment has fallen to the levels projected in 2005, nor do they explain why they can no longer mitigate the impacts of the higher levels. (See *Save Our Schools v. Barstow Unified School Dist. Bd. of Education* (2015) 240 Cal.App.4th 128, 145 [decision to close schools did not moot CEQA challenge because school district could reverse or mitigate the decision].)

We need not reach the parties' additional CEQA arguments.[5]

---

[5] We deny respondents' request for judicial notice of Save Berkeley's petition for writ of mandate challenging the Goldman School EIR. (See *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135, fn. 1 [only relevant evidence admissible by judicial notice].)

19

**E.**

Finally, Save Berkeley argues the trial court abused its discretion in denying its motion to compel discovery. Save Berkeley has not met its burden, as the appellant, to show error.

**1.**

Save Berkeley elected to prepare the record of proceedings, pursuant to section 21167.6, subdivision (b)(2). It served a request for production of documents on respondents. In particular, in requests one through four, Save Berkeley requested all documents relating to increased enrollment prepared in connection with the preparation and adoption of U.C. Berkeley's 2020 development plan (in 2005) and, in requests five and six, all documents referring or relating to increases in enrollment that were prepared after adoption of the 2020 development plan or certification of the 2005 EIR. Respondents objected on several grounds, including that the requests were overbroad, and did not produce any documents. Save Berkeley filed a motion to compel production of documents responsive to its first set of document requests. The trial court denied Save Berkeley's motion to compel, concluding the requests for production were overbroad.

---

We also deny amicus curiae City of Berkeley's request for judicial notice. (See *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1047, fn. 12 [" 'an amicus curiae accepts the case as he finds it and may not "launch out upon a juridical expedition of its own unrelated to the actual appellate record" ' "]; *Ketchum v. Moses, supra,* 24 Cal.4th at p. 1135, fn. 1.)

**2.**

Save Berkeley concedes it may no longer challenge the 2005 EIR. Nonetheless, it makes no attempt to explain why its document requests one through four, which seek documents prepared in or before 2005, are not overbroad. Save Berkeley also does not justify the breadth of requests five and six as currently written. Despite alleging respondents made informal decisions to increase enrollment starting in 2007, requests five and six seek all documents relating to enrollment increases prepared after adoption of the 2020 development plan (in 2005) or certification of the 2005 EIR. Further, Save Berkeley has not limited the scope of these requests in any other way—such as by requesting documents prepared in connection with any particular decision or document.

An order challenged on appeal is presumed to be correct, and it is the appellant's burden to demonstrate error. (*Howard v. Thrifty Drug & Discount Stores* (1995) 10 Cal.4th 424, 443.) With respect to the discovery order, Save Berkeley has not done so.

## DISPOSITION

The judgment is reversed. The action is remanded with directions that the trial court vacate its order sustaining the demurrer and issue a new order overruling the demurrer. Save Berkeley is awarded its costs on appeal.

_____
BURNS, J.

We concur:

_____
SIMONS, ACTING P.J.

_____
NEEDHAM, J.

A157551

Alameda County Superior Court, Case No. RG18902751, Hon. Frank Roesch and Hon. Noël Wise

Law Offices of Thomas N. Lippe, APC, Thomas N. Lippe, for Plaintiff and Appellant.

The University of California Office of General Counsel, Charles F. Robinson and Alison Krumbein; Meyers, Nave, Riback, Silver & Wilson, Amrit S. Kulkarni, Timothy D. Cremin and Edward Grutzmacher, for Defendants and Respondents.