Filed 2/10/21  Concerned Citizens of Beverly Hills etc. v. City of Beverly Hills CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| CONCERNED CITIZENS OF BEVERLY HILLS/BEL AIR,<br><br>        Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF BEVERLY HILLS,<br><br>        Defendant and Respondent,<br><br>LOMA LINDA TRUST,<br><br>        Real Party in Interest and Respondent. | B297931<br><br>(Los Angeles County<br>Super. Ct. No. BS171828)<br><br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on January 14, 2021, be modified as follows:

1.  On page 3, line 10 of the first full paragraph, the word "designated" is inserted between the words "to" and "environmental" so the sentence reads:

> The second of these exceptions focuses on a *project's surroundings*, that is, whether the project poses special risks to the environment because of its location or its relationship to designated environmental resources, such as natural phenomena like wildlife.

2.  On page 4, line 4 of the first full paragraph, insert "s" at the end of the word "circumstance" so the sentence reads:

> As set forth in our Discussion, we conclude that under *Berkeley Hillside*, the substantial evidence standard of review dictates our review of whether the City erred in finding that the unusual circumstances and location exceptions did not apply to the Project and reject Citizens's contention that our review is less deferential under a "fair argument" standard of review.

3.  On page 11, lines 4 to 6 of the first full paragraph, the sentence beginning with "Next" and ending with "(Italics added.)" is deleted.

4.  On page 11, the second sentence of the last paragraph, beginning with "The MRCA" and ending with "sensitive area" is modified to read as follows:

> The MRCA asserted that the same environmental concerns the City noted in its 2013 MND regarding the 2013 Project are true as to the current proposed Project, that is the Properties are located "fewer than 150 feet of [*sic*] the publicly-owned Franklin Canyon Park." "This park is part of Habitat Block No. 74," an area designated by the MRCA as an environmentally sensitive area.

5. On page 12, second sentence of the last paragraph, beginning with "Specifically" and ending with "developed" is modified to read as follows:

As explained by City Planner Gohlich, there were no "unusual circumstance[s] regarding biological resources that would apply here, especially because these properties were previously developed.

6. On page 13, first sentence of the second full paragraph is modified to read as follows:

As to the location exception challenge, Gohlich observed "this particular property is not within [Habitat Block No. 74]."

7. On page 14, third paragraph of subsection F, the first sentence is modified to read as follows:

The trial court also rejected Citizens's arguments that, because of the Project's proximity to Habitat Block No. 74, a habitat zone designated by the MRCA, it qualified for an exception to the Class 3 exemption.

8. On page 17, line 1, quotation marks are added around the word "project" so the line reads:

building two Residences on the Properties would be a "project"

9. On page 22, line 2 of the last paragraph, the word "explicitly" is deleted so the sentence reads:

Citizens's argument that we should apply the fair argument standard of review fails because the City found there were no unusual circumstances involving the Project, and as discussed below, that finding is supported by substantial evidence.

3

10.  Footnote 9, commencing at the bottom of page 22 and ending at the bottom of page 23, is deleted and the following is inserted in its place:

**9** We would have had to proceed to the second level of *Berkeley Hillside* review if city planner Gohlich had not expressly found there were no unusual circumstances involving the Project.  (See *Respect Life*, *supra*, 15 Cal.App.5th at p. 458.)  Because the City only heard testimony from Gohlich on CEQA compliance, the record is unequivocal that the City rejected Citizens's unusual circumstances challenge at the first level:  Gohlich found there were no unusual circumstances involving the Project (first level), and the city engineer thereafter recommended approval of the Project as "categorically exempt [under CEQA]," "as [Gohlich] explained."  Other Courts of Appeal have likewise attributed the findings of an agency's CEQA compliance expert to the agency itself while performing *Berkeley Hillside* review where only a single CEQA compliance expert testified, the expert's testimony unequivocally revealed at which level the lead agency was rejecting the project opponent's unusual circumstances challenge.  (See, e.g., *Aptos Residents Assn. v. County of Santa Cruz* (2018) 20 Cal.App.5th 1039, 1043, 1053.)  To the extent Citizens argues the absence of express, detailed findings made by the lead agency itself when it votes to approve a project automatically triggers the fair argument standard of review—even where the record is unequivocal as to at which level the agency is rejecting an unusual circumstances challenge—Citizens provides no supporting legal authority, and we deem such an argument waived.  (See *In re A.C.* (2017) 13 Cal.App.5th 661, 672.)

4

11.  On page 25, line 1 of the first full paragraph, an "'s" is added at the end of the word "Citizens" so the sentence reads:

> Second, Citizens's contention that "new fencing" could "sever[ ]" the nearby "habitat linkage system" similarly fails.

12.  The paragraph commencing at the bottom of page 27 and ending at the top of page 28, is modified to read as follows:

> Here, Citizens is correct that Habitat Block No. 74 is indeed a "location" "designated" as an "environmental resource of hazardous or critical concern" by any federal, state or local agency.  (Guidelines, § 15300.2, subd. (a).)  Unlike in *Salmon Protection*, the Properties are not located in that designated environmental resource.  Instead, they are *outside* Habitat Block No. 74 (and, *a fortiori*, outside Franklin Canyon Park), and are separated from that zone by at least one other residential property.

13.  On page 28, the first full paragraph, beginning with "Citizens also" and ending with "surrounding area" is deleted.

14.  On page 30, lines 1 to 3, the sentence beginning with "Citizens cites" is modified to read as follows:

> Citizens cites to a map that the City prepared indicating that the Properties lie within a "Fire Hazard Severity Zone."

15.  On page 30, line 3 of the second full paragraph, the word "in" is changed to "within" so the sentence reads:

> In *Watershed Coalition*, the First District recently rejected a "location exception" argument predicated on a project's location within earthquake and landslide zones.

5

There is no change in the judgment. Appellant's petition for rehearing is denied.

_____
SINANIAN, J.*            ROTHSCHILD, P. J.            BENDIX, J.

_____

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 1/14/21  Concerned Citizens of Beverly Hills etc. v. City of Beverly Hills CA2/1
(unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CONCERNED CITIZENS OF BEVERLY HILLS/BEL AIR,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF BEVERLY HILLS,<br><br>Defendant and Respondent,<br><br>LOMA LINDA TRUST,<br><br>Real Party in Interest and Respondent. | B297931<br><br>(Los Angeles County Super. Ct. No. BS171828) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard L. Fruin, Judge.  Affirmed.

Channel Law Group, Jamie T. Hall and Julian K. Quattlebaum, III for Plaintiff and Appellant.

Laurence S. Wiener, City Attorney for Beverly Hills; Richards, Watson & Gershon, Ginetta L. Giovinco and Stephen D. Lee for Defendant and Respondent.

Allen Matkins Leck Gamble Mallory & Natsis and Patrick A. Perry for Real Party in Interest and Respondent.

_____

**INTRODUCTION**

Before us is the review of a finding by respondent City of Beverly Hills (City) that the construction of two single-family homes (the Project) located on two adjacent parcels of land on Loma Linda Drive (the Properties) is exempt from filing environmental review documents otherwise required by the California Environmental Quality Act (CEQA; Pub. Resources Code,[1] § 21000 et seq.).  The owner of these properties is respondent real party in interest Loma Linda Trust (Real Party).

As detailed below, the City found that two exemptions from having to prepare an environmental impact report (EIR) or negative declaration[2] applied to the Project: the Class 2 and Class 3 exemptions.  The Class 2 exemption exempts projects that replace or reconstruct existing structures (Cal. Code Regs., tit. 14, § 15302, Guidelines for Implementation of CEQA (Guidelines)) (Class 2 exemption), and the Class 3 exemption

---

[1] All further unspecified statutory references are to the Public Resources Code.

[2] We describe these documents in our Factual Background and Procedural History.

2

exempts small construction projects, including the construction of one to three single-family homes (Guidelines, § 15303) (Class 3 exemption). The City approved the Project based on both exemptions. Because we conclude that substantial evidence supports the City's findings that the Project qualifies for the Class 3 exemption, we do not address the City's findings regarding the Class 2 exemption.

The Class 3 exemption is subject to certain exclusions known as "exceptions." Two such exceptions are potentially applicable here. Very simply summarized, the first of these exceptions focuses on whether the *project itself* is "unusual," in the sense that it has some feature distinguishing it from others in the exempt class, and that this unusual feature poses a risk to the environment. The second of these exceptions focuses on a *project's surroundings*, that is, whether the project poses special risks to the environment because of its location or its relationship to environmental resources, such as natural phenomena like wildlife. We refer to these exceptions in the body of our opinion as the "unusual circumstances" and "location" exceptions.

Appellant Concerned Citizens of Beverly Hills/Bel Air (Citizens) directs its challenges on appeal primarily to the City's findings that these exceptions do not apply to the Project. Citizens also asserts that the City defined the proposed Project improperly so as to avoid further CEQA review.

Stating the issue before us is the simple part. Elucidating our conclusion that substantial evidence supports the City's determinations is not. The administrative record regarding development of the Properties is extensive and spans several years. CEQA itself is complex, as are the authorities interpreting it. We thus divide our opinion into three parts.

3

First, in our Factual Background and Procedural History, we set forth in chronological order the proceedings before the City involving Real Party's efforts to develop the Properties. Second, we outline the analytic structure of CEQA, particularly focusing on the Class 3 exemption and exceptions to that exemption. Third, in our Discussion, we apply that analytic structure to the record. We start with our standard of review, which itself is multi-layered under our high court's guidance in *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086 (*Berkeley Hillside*).

As set forth in our Discussion, we conclude that under *Berkeley Hillside*, the substantial evidence standard of review dictates our review of whether the City erred in finding that the unusual circumstance and location exceptions did not apply to the Project and reject Citizens's contention that our review is less deferential under a "fair argument" standard of review. Finally, we discuss the administrative record set forth in our Factual and Procedural Background and conclude that the City did not err in finding that the Class 3 exemption exempted the Project from further CEQA review and that none of the exceptions to that exemption applies to the Project.

We thus affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    The Subject Properties

The Properties are located in Beverly Heights on 1184 Loma Linda Drive (the 1184 Property) and 1193 Loma Linda Drive (the 1193 Property). We refer to the 1184 Property and the 1193 Property collectively as the "Properties," refer to each as "a Property," and refer to the single-family residences Real Party intends to construct atop each Property as "the Residences." The

4

City has zoned the Properties as "R-1," suitable for single-family residential use.[3]  They are bordered by other single-family residences and are located at the end of a cul-de-sac at the end of Loma Linda Drive, a single-lane residential street that is currently 22 feet wide.

Some time before 2013, one single-family home and one guest house sat atop the parcels currently comprising the Properties.  Real Party removed these structures in order to prepare the site for future development.  There are no structures currently on the Properties.

In 2013, Real Party proposed to construct a single-family residence that would straddle both Properties.  This attempt to create a single structure began by filing applications for various permits with the City.  We refer to Real Party's submission of permits to construct this residence as the "2013 Application," and the project envisioned by the 2013 Application as the "2013 Project."

The 2013 Application proposed a 23,632 square feet single-family residence with an attached office and guest house.  In order to create this structure, Real Party would have needed to export approximately 8,081 cubic yards of earth material.  The various approvals required to build the 2013 Project included a Hillside R-1 Permit to export more than 3,000 cubic yards of earth material, a Tree Removal Permit for the removal of an existing Canary Island pine tree, and approval of a street

---

[3] Zoning groups R-1 to R-4 "generally involve[ ] dwellings, congregate care facilities and some other types of residential care facilities, as well as houses and apartments."  (7 Miller & Starr, Cal. Real Estate (4th ed. 2020) § 25:6.)

vacation and acceptance of a street dedication to replace the existing turnaround at the end of Loma Linda Drive with a fire truck turnout.

Unlike the Project that is before us, the City did not find the now-abandoned 2013 Project exempt from CEQA review. Instead, the City moved to the next step in the CEQA process and conducted an "initial study" to determine the 2013 Project's possible environmental impacts. (See generally *Save Our Schools v. Barstow Unified School Dist. Bd. of Education* (2015) 240 Cal.App.4th 128, 137-139 [describing steps in the CEQA process].) The City then had two choices: to order preparation of an EIR, or order preparation of a "negative declaration."[4]

Here, the City filed a "mitigated" negative declaration in connection with the 2013 Project (the 2013 MND). By filing the 2013 MND, the City found that although "the initial study has identified potentially significant effects on the environment, . . . (1) revisions in the project . . . would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the [City] that the project, as revised, may have a significant effect on the environment." (§ 21064.5; see, e.g., *Mejia v. City of Los Angeles* (2005) 130 Cal.App.4th 322, 332.)

---

[4] An agency may file a negative declaration instead of an EIR when the agency's "initial study" determines there is no substantial evidence that the project may have a significant effect on the environment. (See § 21064; see, e.g., *Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1188-1191.)

6

In the end, the 2013 Project did not go forward. Real Party explains in its briefing that it abandoned the 2013 Project "[d]ue to community opposition."

## B.     The 2016 Project

The Project before us involves Real Party's second attempt to build on the Properties, which also has garnered community opposition. The current Project envisions *two* single-family homes—one atop *each* Property.

Real Party filed separate building permits for each Property. The building permit application for the 1193 Property sought permission to build a two-story, 8,194 square-foot single-family home with a 2,629 square-foot basement. The building permit application for the 1184 Property sought permission to build a two-story, 7,924 square-foot single-family home with a 5,838 square-foot basement and garage.

In response to a city ordinance, Real Party redesigned the Project to reduce the export of earth material below the level that would have required an R-1 building permit from the City for the Project.[5] Real Party also agreed to the City's demand that Real Party grant it easements and make improvements to Loma Linda

---

[5] On August 30, 2016, the Beverly Hills City Council (City Council) adopted Ordinance No. 16-O-2709, which amended the Beverly Hills Municipal Code to reduce the amount of export that would require approval of an R-1 permit from 3,000 cubic yards to 1,500 cubic yards on any site in the City's Hillside area that is adjacent to a street that is less than 24 feet wide. Following adoption of this ordinance, Real Party modified the plans for the Residences such that the amount of export required would be less than 1,500 cubic yards, thereby avoiding the need for an R-1 permit.

Drive to improve emergency vehicle access in the event of a fire. Specifically, the City demanded that Real Party (1) dedicate easements for a fire truck turnaround on both Properties, (2) agree to remove all encroachments in the easement area, and (3) construct street improvements required for the fire turnaround.

## C.    Review of the Project by the City

The City's planning commission held its first public hearing on the Project on October 12, 2017.  At that hearing, it unanimously adopted Resolution Nos. 1825 and 1826 in which it found that the aforementioned easements dedicated for a firetruck turnaround were consistent with the City's "General Plan."[6]  The City Council held a second hearing on November 7, 2017, at which it adopted Resolution No. 17-R-13165 approving agreements between the City and Real Party containing the easement dedications for public safety purposes along Loma Linda Drive adjacent to the 1184 Property and 1193 Property.

Mayor Lili Bosse began the hearing by emphasizing that "[p]ermits for the two [Residences] are contingent upon the City Council's acceptance of the offers of dedication [of the fire-safety enhancing easements] and approval of a vacation of a storm drain easement."  She stressed the current cul-de-sac on Loma Linda Drive "make[s] it difficult for emergency vehicles to access the area."

Fire Marshall Scott Stevens testified that the "existing turnaround [on Loma Linda Drive] is inadequate," and

---

**6** See *NJD, Ltd. v. City of San Dimas* (2003) 110 Cal.App.4th 1428, 1444-1446 [discussing a city's "general plan" and a city's "specific plan"].

8

"compromises response times." The proposed dedication of easements would ameliorate this hazard by transforming the surface of the road from asphalt to concrete, installing a fire hydrant, and widening Loma Linda Drive itself so that emergency vehicles could more safely navigate this street. Fire Marshall Stevens further explained that from the Fire Department's perspective, approving the Project was the "best option" to improve fire-safety hazards on Loma Linda Drive because the needed improvements are "outside of the public right-of-way and, therefore, require[ ] easements on private property."

City Planner Ryan Gohlich advised the City Council on CEQA compliance. He stated that for CEQA purposes, the Project consisted not only of the proposed easements, but also the proposed two Residences. He also advised that the City did not need to order preparation of an EIR or negative declaration because two exemptions applied to the Project: Class 2 and Class 3. Regarding the Class 3 exemption, he stated: "Those two houses are within the three-house limit for a Class 3 categorical exemption and that Class 3 exemption does also contemplate street improvements and utilities that are associated with the development of those homes." As to Class 2 exemption status, Gohlich observed although the proposed homes "are [of a] different scale," "each one is still by in [*sic*] use of a [*sic*] single-family home." Apparently, Gohlich was comparing the proposed construction to the buildings that had existed on the Properties before Real Party first sought to develop the properties in 2013. The buildings no longer were on the property as of 2016.

The City Council found the Project qualified for the Class 3 exemption because it contemplated construction of *two* single-

9

family homes and the Guidelines describing the Class 3 exemption provide that construction of up to *three* single-family residences is exempt from CEQA review. (See Guidelines, § 15303, subds. (a) and (d).) The City Council found the Project qualified for the Class 2 exemption because it contemplated construction of "two single family homes on two separate lots that previously had single family residences developed on them, thus replacing existing single family homes."

## D. Opposition to the Project at the November 7, 2017 City Council Hearing

At the November 7, 2017 hearing, the City Council also heard public comment and received evidence in opposition to the Project.

Several neighbors testified against the Project. One claimed the Project would "create [a] three-story birthday cake structure[ ] that will loom over homes in the Coldwater Canyon Park below invading their privacy and sightlines." Another stated it was "the will of the community to deny the monstrous proposed development . . . [g]iven its potential destruction of our neighborhood character." A third stressed the Project "will impact the view of many homes on surrounding canyon slopes." A fourth neighbor stated that "there are regularly deers [*sic*] in my yard and a turtle recently showed up to live in my pond."

Citizens's counsel also testified in opposition to the Project. First, he argued that the Class 2 exemption did not apply to the Project because there were no existing structures on the Properties, and even if one compared the Project to the structures that existed on the Properties in 2013, the proposed Residences would not have the requisite same purpose and capacity as those they would be replacing. (See Guidelines, § 15303.) To support

10

an exception to the Class 3 exemption, counsel focused on the relationship of the Properties to nearby wildlife.

The City also received two written statements in opposition to the Project. One was from Citizens's counsel. This letter stated that the 2013 MND described the Properties as being "adjacent" to Franklin Canyon Park. Next, this letter represented the Project was located "*within* Habitat Block 74 by the Santa Monica Mountains Conservancy." (Italics added.) Citizens represented, without evidentiary foundation, that many rare animals "have been seen by residents in the area at one time or another." Attached to the letter was a photo of a bobcat apparently seen in a neighbor's backyard that counsel interpreted as moving toward the Properties in an effort "to access open space." Citizens's letter also stated: "The project site is also located in [a] Very High Fire Severity Zone which is an officially adopted hazard designation."

The other letter was from the Mountains Recreation and Conservancy Authority (MRCA). The MRCA asserted that the same environmental concerns the City noted in its 2013 MND regarding the 2013 Project are true as to the current proposed Project, that is the Properties are located "fewer than 150 feet" from Franklin Canyon Park, an area designated by the MRCA as an environmentally sensitive area. It also stressed that the Properties "sit on a visually prominent ridgeline between lower Franklin Canyon and lower Coldwater Canyon," and that "[w]ildlife movement between these two canyon habitats has become increasingly restricted due to development."

11

**E. City Rejects Opposition to the Project and Files Notice of Exemption from CEQA**

On November 14, 2017, the City posted a notice of exemption stating that the Project was categorically exempt from further review under CEQA. The notice of exemption states: "The Project involves dedications of [emergency] vehicle access easements in conjunction with proposed construction of two houses on previously developed lots at 1184 and 1193 Loma Linda Drive in Beverly Hills. The dedications and related street improvements would result in improved turnaround at the terminus of Loma Linda Drive for improved emergency vehicle access which benefits the public."

The City rejected Citizens's arguments that the presence of "unusual circumstances" involving the Project and its proximity to Franklin Canyon Park were circumstances that justified an exception to the Class 3 exemption. Specifically, Gohlich testified that there were no "unusual circumstance[s] regarding biological resources that would apply here, especially because these properties were previously developed. They are disturbed. They don't contain really any viable habitat that would constitute a substantial evidence that there would be an impact."[7] Gohlich emphasized: "This is an urbanized area. Yes, it's in the hills but it's urbanized."

---

[7] Indeed, Gohlich observed that Real Party had completely reconfigured its plans to develop the Properties in part to avoid an obstacle it faced with the now-abandoned 2013 Project. The obstacle was a tree that was a supposed habitat for birds and other wildlife, and the current Project no longer proposed to remove it.

12

The City also found that the Project complied with its general plan. Subsequent to the October 12, 2017 hearing, the City planning commission authored a report that concluded the Project satisfied 12 general plan requirements regarding hillside development ("[m]aintain the natural landforms that define the City"), architectural and site design ("new construction [must] exhibit a high level of excellence"), public and fire safety, traffic, and storm drainage.

As to the location exception challenge, Gohlich observed "this particular property is not within the habitat block." He continued, "it's also not directly adjacent. There are—there's at least one property that separates the subject property from Franklin Canyon and the habitat block that is there." Responding to Citizens's claim that the MRCA letter shows the Properties are *within* a protected habitat block, Gohlich testified: "It's also been noted in the correspondence [from the MRCA] that there are habitat linkages or trails that are used that go across the [Properties] on Loma Linda Drive. *When in fact you look at the habitat linkage map that has been provided by the Santa Monica Conservancy there are no linkage trails that go through these properties.* There are some identified that are in Trousdale Estates and then further north of Beverly Hills, *but there is nothing that goes specifically through these propertie*s." (Italics added.)

Regarding fire risk in the area, the City concluded the proposed easements and street improvements "will result in substantial life safety improvements . . . by making it easier for large fire trucks to safely turn around at the terminus of Loma Linda Drive without having to travel in reverse down the street to Coldwater Canyon, and to allow multiple vehicles, such as a

13

fire truck and ambulance, to pass each other in emergency situations."

The City also rejected Citizens's challenge to the Class 2 exemption, finding that the Project involved "construction of two single family homes on two separate lots that previously had single family residences developed on them, thus replacing existing single family homes."

## F.     Trial Court Proceedings

Citizens filed a writ of mandate in the trial court challenging the City's decision not to proceed further in its environmental review.  On March 8, 2019, the court held a trial on Citizens's verified petition for writ of mandate and issued a statement of decision and denied the petition.

The trial court ruled that the City had properly found the Project was exempt under Class 2.  Although agreeing with Citizens that the new structures would be "larger because they include, unlike those previously on the lots, two-levels as well as a basement," the court observed this distinction is not relevant because "there is no evidence that the structure does not serve the same purpose and capacity" as the structures they were replacing.

The trial court also rejected Citizens's arguments that, because of the Project's proximity to a habitat zone designated by the MRCA, it qualified for an exception to the Class 3 exemption. The trial court rejected Citizens's attempts to equate proximity to a protected habitat zone with presence within a protected habitat zone.  The court observed:  "There is no substantial admissible evidence, however, that the Project located on a ridge above the [p]ark 'may impact' this environmental resource.  [Citizens] relies on the representations of its own lawyers that wildlife 'have been

14

seen by residents in the area at one time or another.' . . . The court regards this contention in an attorney's letter as argument offered without evidentiary foundation and, therefore, to lack probative value. [Citizens] offers nothing else."

The trial court's statement of decision also indicates that Citizens moved for judicial notice of 10 documents not presented to the City during its review, as well as a supplemental request for judicial notice of an 11th document. These documents included city ordinances, resolutions, and staff reports. Real Party objected, citing the rule that "a mandate petition [only] reviews documents submitted to the public agency." The trial court declined to judicially notice all but a "Planning Commission Report," dated December 11, 2014. The trial court reasoned that the correct procedure would have been for Citizens to move to augment the administrative record before the trial court. Citizens never did so. The court concluded it would not "take judicial notice of documents that were not before the decision-making body at the time it took the action that is challenged." Citizens does not challenge this ruling on appeal.[8]

Citizens timely appealed from the trial court's denial of its writ of mandate.

---

[8] In its opening brief on appeal, Citizens still cites to documents the trial court declined to judicially notice. Citizens never filed a motion to augment the record. Real Party, however, did, on appeal only. We improvidently granted that motion and hereby deny it.

15

## DISCUSSION

### A.   Applicable Law and Standard of Review

In reviewing the City's actions "for compliance with CEQA, we ask whether the agency has prejudicially abused its discretion; such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.'  (. . . § 21168.5.)  In determining whether there has been an abuse of discretion, we review the agency's action, not the trial court's decision.  '[I]n that sense appellate judicial review [of the trial court's decision] under CEQA is de novo.'  [Citation.]"  (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 215, fn. omitted.)

Before discussing whether the City erred in finding that the Project qualified for a Class 3 exemption, we set forth CEQA's regulatory architecture to provide context for our review.

#### 1.   *CEQA Review Only Applies to "Projects"*

The first decision in reviewing a proposed activity for CEQA compliance is to determine whether that activity qualifies as a "project."  CEQA only applies to "discretionary projects proposed to be carried out or approved by public agencies." (§ 21080, subd. (a); *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1190 (*Union of Medical Marijuana Patients*).)

The scope of a "project" is defined as "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ."  (Guidelines, § 15378, subd. (a); *Union of Medical Marijuana Patients*, *supra*, 7 Cal.5th at p. 1192.)  Citizens does not appear to dispute that

16

building two Residences on the Properties would be a project subject to CEQA.

2. *Exemptions from CEQA Review*

If a proposed activity is a "project," "the agency must decide whether the activity qualifies for one of the many exemptions that excuse otherwise covered activities from CEQA's environmental review." (*Union of Medical Marijuana Patients*, *supra*, 7 Cal.5th at p. 1185.) The Secretary of the Natural Resources Agency (Secretary) has established "a list of classes of projects that have been determined not to have a significant effect on the environment and that shall be exempt from" CEQA. (§ 21084, subd. (a).) The Secretary "has found" that certain "classes of projects . . . do not have a significant effect on the environment" and, in administrative regulations known as guidelines, has listed those classes and "declared [them] to be categorically exempt from the requirement for the preparation of environmental documents." (Guidelines, § 15300.) These exemptions are known as "categorical exemptions." Although there are other kinds of exemptions, the case before us involves only categorical exemptions.

The Class 3 exemption, entitled "New Construction or Conversion of Small Structures," "consists of construction and location of limited numbers of new, small facilities or structures." (Guidelines, § 15303.) Among the nonexclusive list identified by the Secretary as qualifying under this exemption are projects consisting of: "One single-family residence, or a second dwelling unit in a residential zone [or] [i]n urbanized areas, up to three single-family residences . . . ." (Guidelines, § 15303, subd. (a).)

17

3.     *Exceptions to Categorical Exemptions*

Categorical exemptions are subject to exceptions.  If an exception applies, the exemption is lost.  The relevant exceptions here are: (i) if there is a reasonable possibility of a significant effect on the environment due to "unusual circumstances" (Guidelines, § 15300.2, subd. (c) [the unusual circumstances exception]); and (ii) with respect to five specific categories of projects, if the project will have impacts on a uniquely sensitive or hazardous environment (Guidelines, § 15300.2, subd. (a) [the location exception]).  Class 3 exempt projects constitute one of the five categories listed in Guidelines, section 15300.2, subdivision (a), subject to the location exception.

a.     The Unusual Circumstances Exception

The Guidelines describe the unusual circumstances exception somewhat opaquely:  "A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances."  (Guidelines, § 15300.2, subd. (c).) Although "[t]he Guidelines do not define 'unusual circumstances' (*Walters v. City of Redondo Beach* (2016) 1 Cal.App.5th 809, 820), our high court has clarified that this exception may be established "by showing that the project has some feature that distinguishes it from others in the exempt class, such as its size or location." (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105.)

b.     The Location Exception

The Guidelines state that the location exception applies "where the project may impact on *an environmental resource* of hazardous or critical concern where designated, precisely mapped, and officially adopted pursuant to law by federal, state, or local agencies." (Guidelines, § 15300.2, subd. (a), italics

18

added.)  The location exception thus applies to projects that may impact on environmental "resources" that are either of "hazardous" or "critical concern."

The Guidelines explain that this exception only applies if the environmental resource has been "designated, precisely mapped, and officially adopted pursuant to law by federal, state, or local agencies."  (Guidelines, § 15300.2, subd. (a).)  If a putative environmental resource has not been "designated" and "precisely mapped" by a public agency, a location exception challenge premised upon impacts on such a putative resource will fail.  (See *Don't Cell Our Parks v. City of San Diego* (2017) 21 Cal.App.5th 338, 363 [rejecting argument that "location exception" applied by virtue of project site's location within a dedicated park, because that location was not "designated" by any federal, state, or local agency as an " 'environmental resource of hazardous or critical concern' "].)

## B.    The City Did Not Err in Describing the Project

Citizens claims the City did not proceed in the manner required by CEQA and the Guidelines.  Specifically, it asserts the City relied upon findings and conclusions based upon "an incorrect description of the project based on faulty legal advice."  Citizens claims the City purposefully misdescribed the Project so that it did not have to consider the environmental impact of the Residences.

Citizens contends the City defined the Project solely as "the acceptance of irrevocable offers of dedication of easements for emergency vehicle access and street improvements located at 1184 and 1193 Loma Linda Drive."  Citizens claims the failure of the City to indicate the Residences themselves were also part of the Project violates the rule that CEQA review " ' "cannot be

19

avoided by chopping up proposed projects into bite-size pieces" which, when taken individually, may have no significant adverse effect on the environment' " or would require only ministerial determinations. (*Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214, 1223.)

This argument ignores other evidence in the record militating against its argument. The notice of exemption itself indicates "dedications are being made in conjunction with ministerial building permits for construction of *two single family homes* on two separate lots." (Italics added.) Mayor Bosse, moreover, began the November 7, 2017 hearing by stating that the "[p]ermits for *the two* [*Residences*] are contingent upon the City Council's acceptance of the offers of dedication [of the fire-safety enhancing easements] and approval of a vacation storm drain easement." (Italics added.)

## C. Substantial Evidence Supports the City's Determination that the Project is Exempt from Further CEQA Review as a Class 3 Exempt Project

The City's notice of exemption states: "Class 3 exemption [applies] because the exemption allows for construction of up to 3 single family homes (the project would enable construction of 2 homes), with street improvements." Citizens focuses its argument on the City's rejection of its contentions that the "unusual circumstances" and "location" exceptions deprive the Project of Class 3 exempt status.

20

1. *Standard of Review of Agency Determinations that the Unusual Circumstances and Location Exceptions Do Not Apply*

Before turning to the merits of Citizens's arguments, we address the applicable standard of review. Citizens argues we should not review the City's rejection of the unusual circumstances and location exceptions to the Class 3 exemption for substantial evidence, but instead, for whether substantial evidence supports a "fair argument" that the Project may have a significant effect on the environment due to the unusual circumstances of the Project, or due to its location.

" 'The "fair argument" test is derived from . . . section 21151, which requires [preparation] of an EIR on any project [that] "may have a significant effect on the environment." ' " (*Jensen v. City of Santa Rosa* (2018) 23 Cal.App.5th 877, 884.) An EIR must be prepared " ' "whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." [Citation.]' " (*Ibid.*)

In *Berkeley Hillside*, our high court held that a party seeking to establish the unusual circumstances exception has the burden to show two elements. These elements are (1) "that the project has some feature that distinguishes it from others in the exempt class, such as its size or location," and (2) that there is "a reasonable possibility of a significant effect [on the environment] due to that unusual circumstance." (*Berkeley Hillside, supra*, 60 Cal.4th at p. 1105.) "This bifurcated approach . . . require[s] findings of *both* unusual circumstances *and* a potentially significant effect." (*Id.* at p. 1115.) The former is a purely factual determination; the latter is a question of causation. An agency need only address the second element if it first finds that some

21

circumstance of the project is indeed unusual. (See *Respect Life South San Francisco v. City of South San Francisco* (2017) 15 Cal.App.5th 449, 458 ["This [second step] presupposes the existence of unusual circumstances"] (*Respect Life*).)

We review an agency's finding on the first element for substantial evidence. (*Berkeley Hillside, supra*, 60 Cal.4th at p. 1114.) If an agency moves to the second step, i.e., the agency has concluded that "a particular project presents circumstances that are unusual for projects in an exempt class," then "the fair argument standard" applies. (*Ibid*.) Under that standard, " 'the reviewing court's function "is to determine whether substantial evidence support[s] the agency's conclusion as to whether" ' there is a fair argument of a reasonable possibility that the activity will have a significant effect on the environment." (*Respect Life, supra*, 15 Cal.App.5th at p. 457, quoting *Berkeley Hillside, supra*, at p. 1115.) If there is substantial evidence supporting a fair argument of a reasonable possibility of significant environmental effects, "then the [agency's] determination that no fair argument can be made constitutes an abuse of discretion and cannot be upheld." (*Respect Life, supra*, at p. 457.)

Citizens's argument that we should apply the fair argument standard of review fails because the City explicitly found there were no unusual circumstances involving the Project, and as discussed below, that finding is supported by substantial evidence.[9] Thus, we do not reach the second step of the *Berkeley Hillside* analysis.

---

[9] We would have had to proceed to the second level of *Berkeley Hillside* review if the City had not expressly found that the Project was exempt. (*Respect Life, supra*, 15 Cal.App.5th at

22

Citizens's argument that we should review the City's finding that the location exception does not apply to the Project under the fair argument standard of review fails for the same reason. Following *Berkeley Hillside*, courts have concluded that "the same bifurcated standard of review is applicable to the location exception." (*Berkeley Hills Watershed Coalition v. City of Berkeley* (2019) 31 Cal.App.5th 880, 890 (*Watershed Coalition*).) "As with the unusual circumstances exception, the determination whether a project is located in 'a particularly sensitive environment' (Guidelines, § 15300.2, subd. (a)) is essentially a factual inquiry, subject to the substantial evidence standard of review." (*Ibid*.) Thus, if an agency rejects a location exception challenge to a project by finding in the first instance that the project is not located within a particularly sensitive environment, we review that determination solely for substantial evidence.

As detailed below, the City reviewed the areas surrounding the Project and found that the location exception did not apply because the Project was not located *within* "a designated,

p. 458 ["[A] court cannot affirm an entity's implied determination that the unusual-circumstances exception is inapplicable by simply concluding that the record contains substantial evidence that the project involves no unusual circumstances. Instead, to affirm such an implied determination, the court must assume that the entity found that the project involved unusual circumstances and then conclude that the record contains no substantial evidence to support either (1) a finding that any unusual circumstances exist (for purposes of the first element) or (2) a fair argument of a reasonable possibility that any purported unusual circumstances identified by the petitioner will have a significant effect on the environment (for purposes of the second element."].)

precisely mapped" environmental resource.  As also detailed below, because substantial evidence supports that factual finding—the first level of *Berkeley Hillside* review—we do not progress to the "fair argument" standard of review—the second level of review under *Berkeley Hillside*.

Citizens also argued that the Project impacts on a sensitive environment because it is located in a fire risk zone.  As we explain below, merely being located in a fire zone is not sufficient to invoke the location exception and Citizens proffered no other evidence to support that exception.

2. *Substantial Evidence Supports the City's Express Finding There Were No Unusual Circumstances Involving the Project*

It was Citizen's burden in the administrative proceedings below " 'to show that the project is not exempt because it falls within one of the exceptions.' " (*Save the Plastic Bag Coalition v. County of Marin* (2013) 218 Cal.App.4th 209, 220, citing Guidelines, § 15300.2; *Berkeley Hillside, supra*, 60 Cal.4th at p. 1105.)

Citizens first asserts that "the undeniable evidence that wildlife is using the property on which the Project is located" is an unusual circumstance that should negate application of the Class 3 exemption.  The City rejected this assertion.  As summarized above, Gohlich concluded there are no "unusual circumstance[s] regarding biological resources," in part because the Properties "don't contain really any viable habitat."  On substantial evidence review, we "resolv[e] all evidentiary conflicts in the agency's favor and indulg[e] . . . all legitimate and reasonable inferences to uphold the agency's finding."  (*Berkeley*

24

*Hillside, supra*, 60 Cal.4th at p. 1114.) The City's conclusion is supported by Gohlich's testimony.

Second, Citizens contention that "new fencing" could "sever[ ]" the nearby "habitat linkage system" similarly fails. As discussed above, Gohlich reviewed the MRCA map identifying nearby linkage trails, and observed that this map shows that the trails do not traverse the Properties. Citizens thus failed to produce evidence that linkage trails would be "severed" by the Project and the City's finding that the Project does not present unusual circumstances was supported by substantial evidence.

Third, Citizens cites to the 2013 MND in which the City's initial study concluded, "Natural slopes are historically unstable and graded and trimmed slopes onsite could be unstable." Without any legal citation and relying only on its own contention in its appellate briefing, Citizens concludes that "[u]nstable natural slopes are not the usual circumstances in which construction of up to three single-family residences occur."

This contention fails to appreciate that since 2013, the Properties have been subject to grading and slope stabilization. Indeed, the administrative record contains a "Grading Permit," wherein the "Job Description" indicates "Grading and dranage [*sic*] for hillside repair of failed slope." Because Citizens's argument is premised upon conditions present in 2013, but thereafter remediated to the evident satisfaction of City officials, it fails. (See *Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 321 [CEQA review must focus on "the actual environmental conditions existing *at the time of CEQA analysis*" (italics added)].)

Fourth, Citizens again relies on the 2013 MND: the project site has "unusual geology." This argument ignores that the City

25

required Real Party to prepare a geotechnical study for its review as a condition for its issuance of the necessary building permits, and that the ensuing 27-page report addressed the City's concerns.  Specifically, the report "recommended that the downhill side of the development envelope be supported with soldier piles."  The report concluded:  "It is the finding of Irvine Geotechnical that construction of the proposed project is feasible from a geologic and soils engineering standpoint . . . ."  This finding is also substantial evidence supporting the absence of unusual circumstances.[10]

> 3. *Substantial Evidence Supports the City's Finding that the Location Exception Does Not Apply*

The Class 3 exemption does not apply where a "project that is ordinarily insignificant in its impact on the environment may in a particularly sensitive environment be significant." (Guidelines, § 15300.2, subd. (a).)  An environmental resource may be "particularly sensitive" in one of two ways: it may be of "critical concern," or it may be "hazardous."  Citizens argues the location exception applies to the Project in both these ways.

> > a. <u>Substantial Evidence Supports the City's Conclusion the Project Would Not Impact an Environmental Resource of Critical Concern</u>

---

[10] Citizens does not argue that the Project presents "unusual circumstances" because the proposed Residences are abnormally large.  Rather, Citizens emphasized the size of the proposed Residences only in connection with its argument that the City erroneously exempted the Project under Class 2.  We do not address this argument because, as noted in our Introduction, it is not necessary given our ruling that the City did not err in finding the Project exempt under Class 3.

26

According to Citizens, the Project's "immediate proximity to the Franklin Canyon Park and Habitat Block No. 74" is an environmental resource of critical concern that triggers the location exception. Citizens also argues that the Project affects a purported wildlife corridor.

Contrary to Citizens's argument, a project's mere *proximity* to an officially mapped environmentally sensitive resource does not preclude the application of a Class 3 exemption under the location exception. Citizens relies on *Salmon Protection & Watershed Network v. County of Marin* (2004) 125 Cal.App.4th 1098 to argue that a project located *adjacent to, but outside* the scope of a protected environmental resource area may nevertheless have an impact on that area.

In *Salmon Protection*, the court held that adoption of a categorical exemption in connection with approval of construction of a single family home was improper where the property (1) was located *within* a designated stream conservation area, (2) was *immediately abutting* a protected anadromous fish stream, and (3) where the house would be within 40 feet of the creek bank, and parking for the house would be just 20 feet from the creek bank. (*Salmon Protection & Watershed Network v. County of Marin, supra*, 125 Cal.App.4th at p. 1103.)

Here, Citizens is correct that Franklin Canyon Park is indeed a "location" "designated" as an "environmental resource of hazardous or critical concern" by any federal, state or local agency. (Guidelines, § 15300.2, subd. (a).) Unlike in *Salmon Protection*, the Properties are not located in that designated environmental resource. Instead, they are *outside* Franklin Canyon Park and are separated from the park by at least one other residential property.

27

Citizens also fails to demonstrate that the Project would impact the nearby Franklin Canyon habitat block, particularly wildlife in the surrounding area.

City Planner Gohlich rejected the claim of Citizens's attorney that the MRCA map showed habitat linkage trails traversed the property:  "When in fact you look at the habitat linkage map that has been provided by the Santa Monica Conservancy there are no linkage trails that go through these properties."

Citizens relies on its attorney's letter submitted to the City Council during its hearings on the Project.  The only "evidence" to which this letter refers is the photograph of the bobcat on a neighbor's property, which counsel interprets as the bobcat's entering the Properties to access open land, and an argument that "portions of the property provide a pathway for animals" because they "have been seen by residents in the area at one time or another."  This letter fails to demonstrate counsel's personal knowledge and is mere speculation that the Project will impact either Habitat Block No. 74 or any other "designated, precisely mapped, and officially adopted" wildlife corridor.  (Guidelines, § 15300.2, subd. (a).)

MRCA's letter does not assist Citizens either.  MRCA stated that "[w]ildlife movement between [lower Franklin Canyon and lower Coldwater Canyon] habitats has become increasingly restricted due to development."  Nowhere does the letter describe where, when, or how such other development has restricted

28

movement of any identified wildlife, or how *this Project* in particular will restrict any such movement.[11]

Citizens also cites testimony by a neighboring property owner at the City Council meeting in which she stated that the Project's retaining walls would "encroach on the wildlife corridor that runs directly alongside." Anecdotes are not data, and this conclusory testimony by a neighboring property owner and hearsay by unidentified "residents in the area" are not "substantial evidence" supporting the existence of a "precisely mapped" environmental resource under the Public Resources Code which disqualifies "unsubstantiated opinion or narrative." (§ 21080, subd. (e).)

In sum, substantial evidence supports the City's finding that the Project is not located *within* an area of critical concern as precisely mapped and so designed by a public agency. Citizens thus fails to carry its burden on appeal to show the City erred in rejecting the location exception based on the presence of a critical concern.

      b.      <u>There is No Evidence the Project Will Impact an Environmental Resource of Hazardous Concern</u>

Citizens observes that the Properties are located in a high fire hazard severity zone. Citizens's argument seems to be that *the mere fact* of the Project's presence within "a fire-prone hillside area of the City" "renders it ineligible for a Class 3 exemption."

_____

[11] Citizens attempts to bolster its argument by citing to other MRCA documents that the trial court declined to judicially notice. We do not respond to arguments based on these documents for the reasons stated in section F of our Factual Background and Procedural History.

Citizens cites to a map that the City prepared indicating that the property lies within a "Fire Hazard Severity Zone."

Citizens is correct that the Project is situated within an officially mapped fire risk zone. But Citizens is incorrect that location in a fire risk zone automatically qualifies as impacting an "environmental *resource* of hazardous or critical concern." (Guidelines, § 15300.2, subd. (a), italics added.)

In *Watershed Coalition*, the First District recently rejected a "location exception" argument predicated on a project's location in earthquake and landslide zones. (*Watershed Coalition, supra*, 31 Cal.App.5th at p. 880.) The court started with an analysis of section 15300.2, subdivision (a), of the Guidelines in which the location exception appears. "Generally, we apply the same rules governing interpretation of statutes to the interpretation of administrative regulations." (*Id.* at p. 890, citing *Berkeley Hillside, supra*, 60 Cal.4th at p. 1097.) "The plain meaning of 'environmental resource' in the location exception does not encompass possible earthquake or landslide zones," because "[a] 'resource' is a 'natural source of wealth or revenue,' or a 'natural feature or phenomenon that enhances the quality of human life.' (Merriam-Webster's Collegiate Dict. (11th ed. 2014) p. 1061.) Earthquakes and landslides are geologic events—and while they are indeed hazardous, they are not 'resources.' " (*Watershed Coalition, supra*, at p. 891, italics omitted.)

Because fire zones are not "resources" any more than earthquake and landslide zones are "resources," Citizens fails to establish an environmental resource of hazardous concern that

would support a location exception.[12]  We conclude that the City did not err in rejecting the applicability of the location exception.

## DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED

SINANIAN, J.[*]

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

---

[12] Citizens makes no argument other than the Project's presence in a fire zone to support its assertion that the Project may impact on an environmental resource of "hazardous" concern.

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

31